# CITY OF OKLAHOMA CITY *v.* TUTTLE, INDIVIDUALLY, AND AS ADMINISTRATRIX OF THE ESTATE OF TUTTLE

No. 83–1919.   Argued January 8, 1985—Decided June 3, 1985

REHNQUIST, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Part II, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined, and an opinion with respect to Part III, in which BURGER, C. J., and WHITE and O'CONNOR, JJ., joined.  BRENNAN, J., filed an opinion concurring in part and concurring in the judgment, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 824.  STEVENS, J., filed a dissenting opinion, *post*, p. 834.  POWELL, J., took no part in the decision of the case.

*Burck Bailey* argued the cause and filed a brief for petitioner.

*Carl Hughes* argued the cause for respondent. With him on the brief were *J. LeVonne Chambers* and *Eric Schnapper.**

JUSTICE REHNQUIST announced the judgment of the Court, and delivered the opinion of the Court with respect to Part II, and an opinion with respect to Part III, in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR joined.

In *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), this Court held that municipalities are "persons" subject to damages liability under § 1 of the Ku Klux Act of 1871, 42 U. S. C. § 1983, for violations of that Act visited by municipal officials. The Court noted, however, that municipal liability could not be premised on the mere fact that the municipality employed the offending official. Instead, we held that municipal liability could only be imposed for injuries inflicted pursuant to government "policy or custom." *Id.,* at 694. We noted at that time that we had "no occasion to address . . . the full contours of municipal immunity under § 1983 . . . ," *id.,* at 695, and expressly left such development "to another day." Today we take a small but necessary step toward defining those contours.

## I

On October 4, 1980, Officer Julian Rotramel, a member of the Oklahoma City police force, shot and killed Albert Tuttle outside the We'll Do Club, a bar in Oklahoma City. Officer Rotramel, who had been on the force for 10 months, had

---

*Michael C. Turpen,* Attorney General, and *David W. Lee,* Assistant Attorney General, filed a brief for the State of Oklahoma as *amicus curiae* urging reversal.

*Burt Neuborne* and *Charles S. Sims* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

responded to an all points bulletin indicating that there was a robbery in progress at the Club. The bulletin, in turn, was the product of an anonymous telephone call. The caller had reported the robbery in progress, and had described the robber and reported that the robber had a gun. The parties stipulated at trial that Tuttle had placed the call.

Rotramel was the first officer to reach the bar, and the testimony concerning what happened thereafter is sharply conflicting. Rotramel's version was that when he entered the bar Tuttle walked toward him, and Rotramel grabbed Tuttle's arm and requested that he stay within the bar. Tuttle matched the description contained in the bulletin. Rotramel proceeded to question the barmaid concerning the reported robbery, but while doing so he once again had to restrain Tuttle from leaving, this time by grabbing Tuttle's arm and holding it. The barmaid testified that she told Rotramel that no robbery had occurred. Rotramel testified that while he was questioning the barmaid Tuttle kept bending towards his boots, and attempting to squirm from the officer's grip. Tuttle finally broke away from Rotramel, and, ignoring the officer's commands to "halt," went outside. When Rotramel cleared the threshold to the outside door, he saw Tuttle crouched down on the sidewalk, with his hands in or near his boot. Rotramel again ordered Tuttle to halt, but when Tuttle started to come out of his crouch Rotramel discharged his weapon. Rotramel testified at trial that he believed Tuttle had removed a gun from his boot, and that his life was in danger. Tuttle died from the gunshot wound. When his boot was removed at the hospital prior to surgery, a toy pistol fell out.

Respondent Rose Marie Tuttle is Albert Tuttle's widow, and the administratrix of his estate. She brought suit under § 1983 in the United States District Court, Western District of Oklahoma, against Rotramel and the city, alleging that their actions had deprived Tuttle of certain of his constitutional rights. At trial respondent introduced evidence concerning the facts surrounding the incident, and also adduced

testimony from an expert in police training practices. The expert testified that, based upon Rotramel's conduct during the incident in question and the expert's review of the Oklahoma City police training curriculum, it was his opinion that Rotramel's training was grossly inadequate. Respondent introduced no evidence that Rotramel or any other member of the Oklahoma City police force had been involved in a similar incident.

The case was presented to the jury on the theory that Rotramel's act had deprived Tuttle of life without due process of law, or that he had violated Tuttle's rights by using "excessive force in his apprehension." App. 38. With respect to respondent's suit against Rotramel individually, the jury was charged that Rotramel was entitled to qualified immunity to the extent that he had acted in good faith and with a reasonable belief that his actions were lawful.[1] Respondent also sought to hold the city liable under *Monell,* presumably on the theory that a municipal "custom or policy" had led to the constitutional violations. With respect to municipal liability the trial judge instructed the jury:

> "If a police officer denies a person his constitutional rights, the city that employs that officer is not liable for such a denial of the right simply because of the employment relationship. . . . But there are circumstances under which a city is liable for a deprivation of a constitutional right. Where the official policy of the city causes an employee of the city to deprive a person of such rights in the execution of that policy, the city may be liable.

> .     .     .     .     .

> "It is the plaintiff's contention that such a policy existed and she relies upon allegations that the city is

---

[1] This case was tried some three weeks prior to our decision in *Harlow* v. *Fitzgerald,* 457 U. S. 800 (1982), which modified the standard for qualified executive immunity. An executive official is now entitled to immunity unless he violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.,* at 818.

grossly negligent in training of police officers, in its failure to supervise police officers, and in its failure to review and discipline its officers. The plaintiff has alleged that the failure of the city to adequately supervise, train, review, and discipline the police officers constitutes deliberate indifference to the constitutional rights of the decedent and acquiescence in the probability of serious police misconduct. . . .

.        .        .        .        .

"Absent more evidence of supervisory indifference, such as acquiescence in a prior matter of conduct, official policy such as to impose liability . . . under the federal Civil Rights Act cannot ordinarily be inferred from a single incident of illegality such as a first excessive use of force to stop a suspect; *but a single, unusually excessive use of force may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision amounting to 'deliberate indifference' or 'gross negligence' on the part of the officials in charge.* The city cannot be held liable for simple negligence. Furthermore, the plaintiff must show a causal link between the police misconduct and the adoption of a policy or plan by the defendant municipality." *Id.*, at 42–44. (Emphasis supplied.)

The jury returned a verdict in favor of Rotramel but against the city, and awarded respondent $1,500,000 in damages. The city appealed to the Court of Appeals for the Tenth Circuit, arguing, *inter alia*, that the trial court had improperly instructed the jury on the standard for municipal liability. In particular, petitioner claimed it was error to instruct the jury that a municipality could be held liable for a "policy" of "inadequate training" based merely upon evidence of a single incident of unconstitutional activity. The Court of Appeals rejected petitioner's claims. 728 F. 2d 456 (1984). Viewing the instructions "as a whole," that court first determined that the trial court properly had instructed the

jury that proof of "gross negligence" was required to hold the city liable for inadequate training. The court then addressed petitioner's contention that the trial court nevertheless had erred in instructing the jury that petitioner could be held liable based on proof of a single unconstitutional act. It distinguished cases indicating that proof of more than a single incident is required, and decided that where, as here, the act "was so plainly and grossly negligent that it spoke out very positively on the issue of lack of training . . . ," the "single incident rule is not to be considered as an absolute . . . ." *Id.*, at 461. The instruction at issue was therefore "proper." *Id.*, at 459. The court also referred to "independent evidence" of inadequate training, and concluded that the "action, coupled with the clearly inadequate training," was sufficient to justify municipal liability. *Id.*, at 461. We granted certiorari because the Court of Appeals' holding that proof of a single incident of unconstitutional activity by a police officer could suffice to establish municipal liability seemed to conflict with the decisions of other Courts of Appeals. 469 U. S. 814 (1984). See, *e. g.*, *Languirand* v. *Hayden*, 717 F. 2d 220, 228–230 (CA5 1983); *Wellington* v. *Daniels*, 717 F. 2d 932, 936–937 (CA4 1983). But cf. *Owens* v. *Haas*, 601 F. 2d 1242, 1246–1247 (CA2 1979).[2] We reverse.

---

[2] The actual "question presented" in the petition for certiorari is:

"Whether a single isolated incident of the use of excessive force by a police officer establishes an official policy or practice of a municipality sufficient to render the municipality liable for damages under 42 U. S. C. § 1983." Pet. for Cert. i.

Although much of the petition for certiorari was directed to pointing out the general uncertainties concerning municipal liability for "inadequate training" of its police force, and although respondent's brief in opposition said nothing to dispel the notion that this general question was presented, we confine our holding to the above question. In reaching our conclusion, however, we find it necessary to discuss the many unanswered questions concerning municipal liability that we must assume have an answer in order to properly address this question.

## II

Before proceeding to the merits, we must address respondent's procedural argument that petitioner failed to object at trial to the "single incident" instruction with sufficient specificity to satisfy Federal Rule of Civil Procedure 51, and that therefore the question is not preserved for our review. We disagree. Respondent first referred to the requirements of Rule 51 in one sentence of her brief on the merits in this Court, at which time respondent did not even suggest that the "single incident" question was not preserved. The issue was raised again at oral argument, and respondent has filed a supplemental postargument brief on the question. But respondent's present protests cannot obscure her prior failures. In the Court of Appeals petitioner argued that proof of a single incident of the use of unreasonable force was insufficient to justify municipal liability, and specifically referred to the trial court's single-incident instruction highlighted above. The claim was rejected on the merits, and the Court of Appeals' opinion does not even mention the requirements of Rule 51, so it seems clear that respondent did not refer to the Rule below. The petition for certiorari again centered on the single-incident issue, but respondent's brief in opposition did not hint that the "questions presented" might not be properly preserved. Respondent's attempt to avoid the question now comes far too late.

We do not mean to give short shrift to the provisions of Rule 51. Indeed, respondent's argument might have prevailed had it been made to the Court of Appeals.[3] But we do not think that judicial economy is served by invoking the

---

[3] Federal Rule of Civil Procedure 51 requires counsel objecting to a jury instruction to "stat[e] distinctly the matter to which he objects and the grounds of his objection." Apparently, the only objection to the single-incident instruction contained in the record consists of the statement: "we make a second objection, your honor, particularly to the one, the Oklahoma City language, the language in the light of the City of Oklahoma City, which is single occurrence language." Tr. 693

Rule at this point, *after* we have granted certiorari and the case has received plenary consideration on the merits. Our decision to grant certiorari represents a commitment of scarce judicial resources with a view to deciding the merits of one or more of the questions presented in the petition. Nonjurisdictional defects of this sort should be brought to our attention *no later* than in respondent's brief in opposition to the petition for certiorari; if not, we consider it within our discretion to deem the defect waived. Here we granted certiorari to review an issue squarely presented to and decided by the Court of Appeals, and we will proceed to decide it. Cf. *On Lee* v. *United States,* 343 U. S. 747, 749–750, n. 3 (1952).

## III

Respondent's lawsuit is brought pursuant to 42 U. S. C. § 1983. Although this Court has decided a host of cases under this statute in recent years, it can never hurt to embark on statutory construction with the Act's precise language in mind. The statute states:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

By its terms, of course, the statute creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere. See *Baker* v. *McCollan,* 443 U. S. 137, 140, 144, n. 3 (1979). Here respondent's claim is that her husband was deprived of his life "without due process of law," in violation of the Fourteenth Amendment, or that he was deprived of his right to be free from the use of "excessive force in his apprehension"—presumably a right secured by

the Fourth and Fourteenth Amendments.[4]  Having established a deprivation of a constitutional right, however,
respondent still must establish that the city was the "person"
who "cause[d] [Tuttle] to be subjected" to the deprivation.
*Monell* teaches that the city may only be held accountable
if the deprivation was the result of municipal "custom or
policy."

In *Monell*, the plaintiffs challenged the defendant's policy
of compelling pregnant employees to take unpaid sick leave
before such leave was necessary for medical reasons, on the
ground that the policy violated the Due Process or Equal
Protection Clauses of the Fourteenth Amendment.  Since
the defendant was a municipal entity, this Court first addressed whether such an entity was a suable "person" as that
term is used in § 1983.  The Court's analysis focused on
§ 1983's legislative history, and in particular on the debate
surrounding the proposed "Sherman amendment" to the 1871
Ku Klux Act, from which § 1983 is derived.  The Sherman
amendment would have held municipalities responsible for
damage to person or property caused by *private* persons
"riotously and tumultuously assembled."  Cong. Globe, 42d
Cong., 1st Sess., 749 (1871).  Congress' refusal to adopt this

---

[4] The trial court correctly charged the jury that a federal right—here a
constitutional right—had to be violated to establish liability under § 1983.
Petitioner did not object to the trial court's description of the rights at
issue, and we do not pass on whether the jury was correctly charged on
this aspect of the case.  The facts of this case are, of course, very similar to
the facts of *Tennessee* v. *Garner, ante,* p. 1, in which we recently held that
"[w]here the officer has probable cause to believe that the suspect poses a
threat of serious physical harm, either to the officer or to others, it is not
constitutionally unreasonable to prevent escape by using deadly force."
*Ante,* at 11.  Here the jury's verdict in favor of Rotramel must have been
based upon a finding that he acted in "good faith and with a reasonable belief in the legality of his actions."  We note that this Court has never held
that every instance of use of "unreasonable force" in effecting an arrest
constitutes a violation of the Fourth Amendment; nor has this Court held
under circumstances such as these that there has been a deprivation of life
"without due process of law."

amendment, and the reasons given, were the basis for this Court's holding in *Monroe* v. *Pape*, 365 U. S. 167, 187–192 (1961), that municipalities were not suable "persons" under § 1983; a more extensive analysis of the Act's legislative history led this Court in *Monell* to overrule that part of *Monroe*. The principal objections to the Sherman amendment voiced in the 42d Congress were that the section appeared to impose a federal obligation to keep the peace—a requirement the Congressmen thought was of doubtful constitutionality, but which in any event seemed to place the municipalities in the position of insurers for harms suffered within their borders. The *Monell* Court found that these concerns, although fatal to the Sherman amendment, were nevertheless consistent with holding a municipality liable "for *its own* violations of the Fourteenth Amendment." *Monell*, 436 U. S., at 683 (emphasis supplied).

Having determined that municipalities were suable "persons," the *Monell* Court went on to discuss the circumstances under which municipal liability could be imposed. The Court's holding that a city could not be held liable under § 1983 based upon theories akin to *respondeat superior* was based in part upon the language of the statute, and in part upon the rejection of the proposed Sherman amendment mentioned above. The Court noted that § 1983 only imposes liability for deprivations "cause[d]" by a particular defendant, and that it was hard to find such causation where liability is imposed merely because of an employment relationship. It also considered Congress' rejection of the Sherman amendment to be telling evidence that municipal liability should not be imposed when the municipality was not itself at fault. Given this legislative history, the *Monell* Court held that only deprivations visited pursuant to municipal "custom" or "policy" could lead to municipal liability. This language tracks the language of the statute; it also provides a fault-based analysis for imposing municipal liability.[5]

---

[5] Although apparently agreeing with the result we reach in light of *Monell*, see *post*, at 842, JUSTICE STEVENS' dissent would have us overrule

The *Monell* Court went on to hold that the sick-leave policy at issue was "unquestionably" "the moving force of the constitutional violation found by the District Court," and that it therefore had "no occasion to address . . . what the full con-

*Monell*'s limitation on municipal liability altogether. We see no reason here to depart from the important and established principle of *stare decisis*. The question we address involves only statutory construction, so any error we may commit is subject to reversal by Congress. Cf. *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406–407 (1932) (Brandeis, J., dissenting). In addition, the law in this area has taken enough 90-degree turns in recent years. *Monell* was decided only seven years ago. That decision, of course, overruled *Monroe* v. *Pape*'s 17-year-old holding that municipalities were never subject to suit under § 1983. One reason why courts render decisions and written opinions is so that parties can order their conduct accordingly, and we may assume that decisions on issues such as this are appropriately considered by municipalities in ordering their financial affairs. The principle of *stare decisis* gives rise to and supports these legitimate expectations, and, where our decision is subject to correction by Congress, we do a great disservice when we subvert these concerns and maintain the law in a state of flux.

We note in addition that JUSTICE STEVENS' position, which is based substantially on his perception of the common law of municipal liability at the time § 1983 was enacted, is by no means representative of all the contemporary authorities. Both the majority and dissenting opinions in *Owen* v. *City of Independence*, 445 U. S. 622 (1980), recognized that certain rather complicated municipal tort immunities existed at the time § 1983 was enacted, see *id.*, at 644–650; *id.*, at 676–679 (POWELL, J., dissenting); we are therefore somewhat surprised to learn that the "common law" at the time applied the doctrine of *respondeat superior* "to municipal corporations, and to the wrongful acts of police officers." *Post*, at 836–837. Even those cases known to allow municipal liability at the time hardly support the broad vicarious liability suggested by the dissent; the famous case of *Thayer* v. *Boston*, 36 Mass. 511, 516–517 (1837), for example, spoke in guarded language that seems in harmony with the limitations on municipal liability expressed in *Monell*. That court stated:

"As a general rule, the corporation is not responsible for the unauthorized and unlawful acts of its officers, though done *colore officii;* it must further appear, that they were expressly authorized to do the acts, by the city government, or that they were done *bona fide* in pursuance of a general authority to act for the city, on the subject to which they relate; or that, in either case, the act was adopted and ratified by the corporation." 36 Mass., at 316–317.

tours of municipal liability may be." *Id.*, at 694–695. Subsequent decisions of this Court have added little to the *Monell* Court's formulation, beyond reaffirming that the municipal policy must be "the moving force of the constitutional violation." *Polk County* v. *Dodson*, 454 U. S. 312, 326 (1981). Cases construing *Monell* in the Courts of Appeals, however, have served to highlight the full range of questions, and subtle factual distinctions, that arise in administering the "policy" or "custom" standard. See, *e. g., Bennett* v. *City of Slidell*, 728 F. 2d 762 (CA5 1984); *Gilmere* v. *City of Atlanta*, 737 F. 2d 894 (CA11 1984), reheard en banc, January 1985; *Languirand*, 717 F. 2d, at 220.

With the development of municipal liability under § 1983 in this somewhat sketchy state, we turn to examine the basis upon which respondent seeks to have liability imposed upon the city. Respondent did not claim in the District Court that Oklahoma City had a "custom" or "policy" of authorizing its police force to use excessive force in the apprehension of suspected criminals, and the jury was not instructed on that theory of municipal liability. Rather, respondent's theory of liability was that the "policy" in question was the city's policy of training and supervising police officers, and that this "policy" resulted in inadequate training, and the constitutional violations alleged. Respondent in her brief says:

> "Respondent offered direct evidence that the shooting was caused by municipal policies. The officer who shot Tuttle testified that city training policies were inadequate and had led to Tuttle's death. The official who was Chief of Police when Tuttle was shot insisted that the shooting was entirely consistent with city policy." Brief for Respondent 13–14.

The District Court apparently accepted this theory of liability, though it charged the jury that the city's "policymakers" could not merely have been "negligent" in establishing training policies, but that they must have been guilty of

"gross negligence" or "deliberate indifference" to the "police misconduct" that they could thus engender.

Respondent then proceeds to argue that the question presented by petitioner—whether a single isolated incident of the use of excessive force by a police officer establishes an official custom or policy of a municipality—is in truth not presented by this record because there was more evidence of an official "policy" of "inadequate training" than might be inferred from the incident giving rise to Tuttle's death. But unfortunately for respondent, the instruction given by the District Court allowed the jury to impose liability on the basis of such a single incident without the benefit of the additional evidence. The trial court stated that the jury could "infer," from "a single, unusually excessive use of force . . . that it was attributable to inadequate training or supervision amounting to 'deliberate indifference' or 'gross negligence' on the part of the officials in charge." App. 44.

We think this inference unwarranted; first, in its assumption that the act at issue arose from inadequate training, and second, in its further assumption concerning the state of mind of the municipal policymakers. But more importantly, the inference allows a § 1983 plaintiff to establish municipal liability without submitting proof of a single action taken by a municipal policymaker. The foregoing discussion of the origins of *Monell*'s "policy or custom" requirement should make clear that, at the least, that requirement was intended to prevent the imposition of municipal liability under circumstances where no wrong could be ascribed to municipal decisionmakers. Presumably, here the jury could draw the stated inference even in the face of uncontradicted evidence that the municipality scrutinized each police applicant and met the highest training standards imaginable. To impose liability under those circumstances would be to impose it simply because the municipality hired one "bad apple."

The fact that in this case respondent introduced independent evidence of inadequate training makes no difference, be-

cause the instruction allowed the jury to impose liability even if it did not believe respondent's expert at all. Nor can we read this charge "as a whole" to avoid the difficulty. There is nothing elsewhere in this charge that would detract from the jury's perception that it could impose liability based solely on this single incident. Indeed, that was the intent of the charge, and that is what the Court of Appeals held in upholding it. The Court of Appeals' references to "independent evidence" in portions of its opinion are thus irrelevant; the general verdict yields no opportunity for determining whether liability was premised on the independent evidence, or solely on the inference sanctioned by the instruction. Cf. *Stromberg* v. *California*, 283 U. S. 359, 367–368 (1931).

Respondent contends that *Monell* suggests the contrary result, because it "expressly provided that an official 'decision' would suffice to establish liability, although a single decision will often have only a single victim." App. 14. But this very contention illustrates the wide difference between the municipal "policy" at issue in *Monell* and the "policy" alleged here. The "policy" of the New York City Department of Social Services that was challenged in *Monell* was a policy that by its terms compelled pregnant employees to take mandatory leaves of absence before such leaves were required for medical reasons; this policy in and of itself violated the constitutional rights of pregnant employees by reason of our decision in *Cleveland Board of Education* v. *LaFleur*, 414 U. S. 632 (1974). Obviously, it requires only one application of a policy such as this to satisfy fully *Monell's* requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy.

Here, however, the "policy" that respondent seeks to rely upon is far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*. To establish the constitutional violation in *Monell* no evidence was needed other than a statement of the policy

by the municipal corporation, and its exercise; but the type of "policy" upon which respondent relies, and its causal relation to the alleged constitutional violation, are not susceptible to such easy proof. In the first place, the word "policy" generally implies a course of action consciously chosen from among various alternatives;[6] it is therefore difficult in one sense even to accept the submission that someone pursues a "policy" of "inadequate training," unless evidence be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate. And in the second place, some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter. Obviously, if one retreats far enough from a constitutional violation some municipal "policy" can be identified behind almost any such harm inflicted by a municipal official; for example, Rotramel would never have killed Tuttle if Oklahoma City did not have a "policy" of establishing a police force. But *Monell* must be taken to require proof of a city policy different in kind from this latter example before a claim can be sent to a jury on the theory that a particular violation was "caused" by the municipal "policy." At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged.

Here the instructions allowed the jury to infer a thoroughly nebulous "policy" of "inadequate training" on the part of the municipal corporation from the single incident described earlier in this opinion, and at the same time sanctioned the inference that the "policy" was the cause of the incident. Such an approach provides a means for circumventing *Monell*'s limitations altogether. Proof of a single

---

[6] One well-known dictionary, for example, defines "policy" as "a definite course or method of action selected from among alternatives and in light of given conditions to guide and determine present and future decisions." Webster's Ninth New Collegiate Dictionary 910 (1983).

incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality,[7] and the causal connection between the "policy" and the constitutional deprivation.[8] Under the charge upheld by the Court of Appeals the jury could properly have imposed liability on the city based solely upon proof that it employed a nonpolicymaking officer who violated the Constitution. The decision of the Court of Appeals is accordingly

*Reversed.*

JUSTICE POWELL took no part in the decision of this case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring in part and concurring in the judgment.

I agree that the "single incident" instruction, *ante,* at 813, is properly before us and therefore join Part II of JUSTICE

---

[7] We express no opinion on whether a policy that itself is not unconstitutional, such as the general "inadequate training" alleged here, can ever meet the "policy" requirement of *Monell.* In addition, even assuming that such a "policy" would suffice, it is open to question whether a policymaker's "gross negligence" in establishing police training practices could establish a "policy" that constitutes a "moving force" behind subsequent unconstitutional conduct, or whether a more conscious decision on the part of the policymaker would be required.

[8] In this regard, we cannot condone the loose language in the charge leaving it to the jury to determine whether the alleged inadequate training would likely lead to "police misconduct." The fact that a municipal "policy" might lead to "police misconduct" is hardly sufficient to satisfy *Monell's* requirement that the particular policy be the "moving force" behind a *constitutional* violation. There must at least be an affirmative

REHNQUIST's opinion.    Although I concur in the judgment
reached by the Court today, I am unable to join the balance
of the plurality opinion.

*Monell* v. *New York City Dept. of Social Services,* 436
U. S. 658 (1978), held that municipalities, like other state
actors, are subject to liability under § 1983 when their poli-
cies "subjec[t], or caus[e] to be subjected, any citizen of the
United States . . . to the deprivation of any rights, privi-
leges, or immunities secured by the Constitution . . . ." 42
U. S. C. § 1983.    I agree with the plurality that today we
must take a "small but necessary step," *ante,* at 810, toward
defining the full contours of municipal liability pursuant to
§ 1983.[1]    However, because I believe that the plurality opin-
ion needlessly complicates this task and in the process unset-
tles more than it clarifies, I write separately to suggest a
simpler explanation of our result.

I

Given the result in this case, in which a jury verdict in
favor of the respondent is overturned, it is useful to keep in
mind respondent's theory of the case.    Respondent intro-
duced two types of evidence at trial.    First, respondent
elicited testimony concerning the circumstances surrounding
Tuttle's killing.    This included Rotramel's admission that he
never saw a weapon in Tuttle's possession, App. 150, 158,
225, and evidence that there was no reasonable ground to
believe that Tuttle had committed a felony.    *Id.,* at 155.[2]

---

link between the training inadequacies alleged, and the particular constitu-
tional violation at issue.

[1] See *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658,
695 (1978).    Since *Monell,* of course, the contours of municipal liability
have become substantially clearer.    See, *e. g., Newport* v. *Fact Concerts,
Inc.,* 453 U. S. 247 (1981) (punitive damages not permitted); *Owen* v. *City
of Independence,* 445 U. S. 622 (1980) (qualified immunity not available to
municipalities).

[2] Rotramel himself admitted at the time he entered the bar, Tuttle was
standing with a drink in his hand.    App. 155.    There was also testimony
that the bartender told Rotramel that no robbery had occurred, *id.,* at

It also included evidence that Rotramel made no effort to employ alternative measures to apprehend Tuttle, *id.*, at 225–226. Second, respondent introduced substantial direct evidence concerning what she alleged to be the city's grossly inadequate policies of training and supervising police officers. An expert testified that Rotramel's training included only 24 minutes of instruction in how to answer calls concerning a robbery in progress, although "these are statistically one of the most dangerous calls that an officer has to handle." *Id.*, at 288. In addition, there was evidence that Rotramel had little or no training in when or how to enter a "blind" building with an armed robbery in progress and whether to wait for a backup unit to arrive. *Id.*, at 146–147. Finally, Rotramel himself seemed to believe that he had been inadequately trained. *Id.*, at 153, 159, 165.

Respondent thus attempted in two ways to show the city's responsibility for the killing of Tuttle. First, respondent proposed to prove that Rotramel's killing of Tuttle was so egregiously out of accord with accepted police practice that the jury could infer from the killing alone that the city's policies and customs concerning the training of police were grossly deficient and were to blame for the incident. Second, respondent hoped to prove the policy or custom of inadequate training by means of direct evidence of the scope and nature of that training.

The trial court permitted respondent to submit both theories to the jury. The jury was instructed that "a single, unusually excessive use of force may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision amounting to 'deliberate indifference' or 'gross negligence' on the part of the officials in charge." *Id.*, at 44. The court had previously instructed that "deliberate indifference" or "gross negligence" on the part of the city was sufficient to prove the existence of a city policy. *Id.*, at 43. Putting these instructions together, the

---

82–83, 106, 234, and Rotramel conceded that no one in the bar told him that a robbery *had* occurred. *Id.*, at 209.

jury could infer solely from evidence concerning the conduct of a single policeman on a single night that the city was liable under § 1983. As for the second theory, the jury was instructed that the city could be held liable "only if an official policy which results in constitutional deprivations can be inferred from acts or omissions of supervisory city officials and if that policy was a proximate cause of the denial of the civil rights of the decedent." *Ibid.*

Having been thus instructed, the jury returned a verdict against the city. There is no way to determine on which theory the jury relied. The trial court denied petitioner's motion for judgment notwithstanding the verdict, holding that "the plaintiff brought forward sufficient evidence regarding inadequate training and procedures to warrant submission to the jury of the issue of municipal liability." *Id.*, at 58. The court believed that "there was considerably more evidence presented here than the fact that [Rotramel], a young man, shot someone in deprivation of their civil rights." Tr. 704. In discussing petitioner's judgment n.o.v. motion, the court explicitly noted that it was "impressed with the evidence that was presented in this case" concerning "the curriculum methods and the lack of supervision and training." *Id.*, at 704–705. The Court of Appeals affirmed. 728 F. 2d 456 (CA10 1984).

The question presented in the petition for certiorari is "[w]hether a single isolated incident of the use of excessive force by a police officer establishes an official policy or practice of a municipality sufficient to render the municipality liable for damages under 42 U. S. C. § 1983." The thrust of petitioner's argument is that it was improper to instruct the jury that it could impose liability on petitioner based solely on evidence regarding Rotramel's actions on the night of Tuttle's killing.

II

A

*Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), held that "Congress *did* intend municipal-

ities and other local government units to be included among those persons to whom § 1983 applies." *Id.,* at 690 (emphasis in original). Nonetheless, we recognized certain limits on the theories of liability that could be asserted against a municipality. As the plurality correctly notes, *ante,* at 817–818, our reading in *Monell* of the legislative history of § 1983, including its rejection of the Sherman amendment, see 436 U. S., at 664–704, led us to conclude that Congress desired not to subject municipalities to liability "without regard to whether a local government was in any way at fault for the breach of the peace for which it was to be held for damages." *Id.,* at 681, n. 40. We therefore concluded that a city could not be held liable under a vicarious liability or *respondeat superior* theory in a § 1983 suit, for such liability would violate the evident congressional intent to preclude municipal liability in cases in which the city itself was not at fault.

Because Congress intended that § 1983 be broadly available to compensate individuals for violations of constitutional rights, see *Owen* v. *City of Independence,* 445 U. S. 622, 650–653 (1980); *Monell, supra,* at 683–687, a municipality *could* be held liable where a plaintiff could show that it was the city itself that was at fault for the damage suffered. To make this showing, a plaintiff must prove, in the broad causal language of the statute, that a policy or custom of the city "subjected" him, or "caused him to be subjected" to the deprivation of constitutional rights. In a case in which the plaintiff carries this burden, the city's liability would be mandated by the language, the legislative history, and the underlying purposes of § 1983.

## B

I agree with the plurality that it is useful to begin with the terms of the statute:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ."

In the language of the statute, the elements of a § 1983 cause of action might be summarized as follows: The plaintiff must prove that (1) a person (2) acting under color of state law (3) subjected the plaintiff or caused the plaintiff to be subjected (4) to the deprivation of a right secured by the Constitution or laws of the United States. Element (4) involves the question of whether there has been a violation of the Constitution or laws of the United States; that issue is not raised by the parties in this case and thus may be ignored here.

Of the three remaining elements of a § 1983 cause of action of relevance here, respondent clearly established two. After *Monell*, a municipality like Oklahoma City undoubtedly is a "person" to whom § 1983 applies. And there can be little doubt that the city's actions establishing particular police training procedures were actions taken "under color of state law," as that term is commonly understood.

The remaining question is causation. In a § 1983 case involving a municipal defendant, the causation element to be proved by the plaintiff may be seen as divided into two parts. First, the plaintiff must predicate his recovery on some particular action taken by the city, as opposed to an action taken unilaterally by a nonpolicymaking municipal employee. This is the inquiry required by *Monell*, and the plaintiff would carry his burden by proving the existence of a particular official municipal policy or established custom.[3] In this case, the municipal policies involved were the set of procedures for training and supervising police officers.[4] Second, the plain-

---

[3] Of course, nothing hinges on whether the "policy or custom" inquiry is seen as a part of the plaintiff's burden to prove causation, or whether instead it is seen as an independent element of a § 1983 cause of action.

[4] These included official decisions concerning the following matters: whether to permit rookie police officers to patrol alone; what rules should govern whether a police officer should wait for backup units before entering a felony-in-progress situation; how much time and emphasis to be

tiff must prove that this policy or custom "subjected" or "caused him to be subjected" to a deprivation of a constitutional right.

The instruction in question in this case permitted the plaintiff to carry his burden of proving "policy or custom" by merely introducing evidence concerning the particular actions taken by Rotramel on the night of October 4, 1980.[5] To isolate the defect in this instruction, it is useful to assume that the jury disbelieved Rotramel's testimony concerning the inadequacy of his training, rejected the evidence presented by respondent's expert concerning the content of the city's police training and supervision practices, and found unconvincing all of respondent's independent and documentary evidence concerning those practices. While perhaps unlikely, such disbelief must be assumed to test an instruction that might have permitted liability without any such evidence. Under the instruction in question, the jury could have found the city liable solely because Rotramel's actions on the night in question were so excessive and out of the ordinary.

A jury finding of liability based on this theory would unduly threaten petitioner's immunity from *respondeat superior* liability. A single police officer may grossly, outrageously, and recklessly misbehave in the course of a single incident. Such misbehavior may in a given case be fairly

---

placed on training in such matters as how to approach felony-in-progress situations, when to use firearms, and when to shoot to kill. Respondent bore the burden at trial of proving that the alleged deprivation of constitutional rights (the killing of Tuttle) resulted from these "conscious choices," *ante,* at 823, made by the city concerning police training and supervision.

[5] Rotramel was a low-level police officer. Some officials, of course, may occupy sufficiently high policymaking roles that any action they take under color of state law will be deemed official policy. See *Monell,* 436 U. S., at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983").

attributable to various municipal policies or customs, either those that authorized the police officer so to act or those that did not authorize but nonetheless were the "moving force," *Polk County* v. *Dodson*, 454 U. S. 312, 326 (1981), or cause of the violation. In such a case, the city would be at fault for the constitutional violation. Yet it is equally likely that the misbehavior was attributable to numerous other factors for which the city may not be responsible; the police officer's own unbalanced mental state is the most obvious example. Cf. *Brandon* v. *Holt*, 469 U. S. 464, 466 (1985). In such a case, the city itself may well not bear any part of the fault for the incident; there may have been nothing that the city could have done to avoid it. Thus, without some evidence of municipal policy or custom independent of the police officer's misconduct, there is no way of knowing whether the city is at fault. To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*.[6]

Respondent objects that in *Monell* and *Owen* v. *City of Independence*, 445 U. S. 622 (1980), we found a municipality liable despite evidence that showed only a single instance of misconduct. If the city's argument here depended on the premise that municipal conduct that resulted in only a single

---

[6] This is in some respects analogous to the doctrine of *res ipsa loquitur* in ordinary tort cases. Only in certain circumstances in ordinary tort cases may a jury infer defendant's fault from the fact that an injury of a certain type occurred. See generally W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 39, p. 243 (5th ed. 1984). The purpose of the restriction is of course to protect the defendant from liability in a case in which he is not at fault and has not caused the injury. The jury instruction in question here similarly would have permitted the city to be held liable, absent fault and causation. This suggests that there may be cases, analogous to those in which the *res ipsa loquitur* doctrine applies, where the evidence surrounding a given incident is sufficient to permit a jury to infer that it was caused by a city policy or custom.

incident was immune from liability, I would have to agree with respondent that *Monell* and *Owen* provide authority to the contrary. A rule that the city should be entitled to its first constitutional violation without incurring liability—even where the first incident was the taking of the life of an innocent citizen—would be a legal anomaly, unsupported by the legislative history or policies underlying § 1983. A § 1983 cause of action is as available for the first victim of a policy or custom that would foreseeably and avoidably cause an individual to be subjected to deprivation of a constitutional right as it is for the second and subsequent victims; by exposing a municipal defendant to liability on the occurrence of the first incident, it is hoped that future incidents will not occur.

The city's argument, however, does not depend on any such unlikely or extravagant premise. It depends instead merely on that fact that a single incident of police misbehavior by a single policeman is insufficient as *sole* support for an inference that a municipal policy or custom caused the incident. And *this* was not an inference comparable to any on which the plaintiffs in *Monell* or *Owen* relied. In *Monell*, both parties agreed that the City of New York had a policy of forcing women to take maternity leave before medically necessary. 436 U. S., at 661, n. 2. This policy, of course, violated the interest we recognized in *Cleveland Board of Education* v. *LaFleur*, 414 U. S. 632 (1974). In *Owen*, the municipality's city council, in the course of dismissing the plaintiff from his post as Chief of Police, passed a resolution releasing to the press material that smeared the reputation of the plaintiff. There was no doubt that the release of the information was an official action—that is, a policy or custom— of the city. Thus, the crucial factor in both cases was that the plaintiff introduced direct evidence that the city itself had acted.[7] In both cases, the jury was not required to draw *any*

---

[7] The distinction between *Monell* and *Owen*, on the one hand, and the instant case, on the other, is thus rather simple. In *Monell* and *Owen*,

further inference concerning the existence of the city policy, let alone an inference from the isolated conduct of a single nonpolicymaking city employee on a single occasion.[8]

## III

For the reasons given above, I agree with the Court that the judgment in this case should be reversed; there may be many ways of proving the existence of a municipal policy or custom that can cause a deprivation of a constitutional right, but the scope of § 1983 liability does not permit such liability to be imposed merely on evidence of the wrongful actions of a single city employee not authorized to make city policy.[9]

---

the plaintiff introduced evidence of official actions taken by the defendant municipality. Respondent here, of course, also introduced evidence concerning official actions taken by the city, mostly centering on the city policies governing training and supervision of police officers. However, as the plurality points out, *ante*, at 821–822, the judgment must be reversed in this case because the instructions permitted the jury to find the city liable even if the jury did not believe this direct evidence. Cf. *Stromberg* v. *California*, 283 U. S. 359, 367–368 (1931).

[8] I do not understand, nor do I see the necessity for, the metaphysical distinction between policies that are themselves unconstitutional and those that cause constitutional violations. See *ante*, at 823–824, and n. 7. If a municipality takes actions—whether they be of the type alleged in *Monell*, *Owen*, or this case—that cause the deprivation of a citizen's constitutional rights, § 1983 is available as a remedy.

[9] The plurality seems to believe that there is a serious threat that a court might submit to a jury the theory that a municipal policy of having a police department was the "cause" of a deprivation of a constitutional right. *Ante*, at 823. Of course, I agree that such a theory should never be submitted to a jury, but the reason has little to do with the presence of the municipality as the defendant in the case or the structure of § 1983. Ordinary principles of causation used throughout the law of torts recognize that "but for" causation, while probably a necessary condition for liability, is never a sufficient condition of liability. See generally Prosser & Keeton on Law of Torts § 41, at 265–266. I would think that these principles are sufficient to avoid the unusual theory of liability suggested by the plurality.

JUSTICE STEVENS, dissenting.

When a police officer is engaged in the performance of his official duties, he is entrusted with civic responsibilities of the highest order.  His mission is to protect the life, the liberty, and the property of the citizenry.  If he violates the Federal Constitution while he is performing that mission, I believe that federal law provides the citizen with a remedy against his employer as well as a remedy against him as an individual.  This conclusion is supported by the text of 42 U. S. C. § 1983, by its legislative history, and by the holdings and reasoning in several of our major cases construing the statute.  The Court's contrary conclusion rests on nothing more than a recent judicial fiat that no litigant had asked the Court to decree.

I

As we have frequently noted, § 1983 "came onto the books as § 1 of the Ku Klux Act of April 20, 1871.   17 Stat. 13."[1] The law was an especially important, remedial measure, drafted in expansive language.[2]  The class of potential defendants is broadly defined by the words "every person."[3] It is now settled that the word "person" encompasses munici-

---

[1] Monroe v. Pape, 365 U. S. 167, 171 (1961).

[2] The section reads:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."   42 U. S. C. § 1983.

[3] "Title 42 U. S. C. § 1983 provides that '[e]very person' who acts under color of state law to deprive another of a constitutional right shall be answerable to that person in a suit for damages.   The statute thus creates a species of tort liability that on its face admits of no immunities, and some have argued that it should be applied as stringently as it reads."  Imbler v. Pachtman, 424 U. S. 409, 417 (1976) (footnotes omitted).

pal corporations,[4] and, of course, it was true in 1871 as it is today, that corporate entities can only act through their human agents.[5] Thus, if Congress intended to impose liability on municipal corporations, it must have intended to make them responsible for at least some of the conduct of their agents.

At the time the statute was enacted the doctrine of *respondeat superior* was well recognized in the common law of the several States and in England.[6] An employer could

---

[4] *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 663 (1978). It should be noted that the contrary proposition announced in Part III of the Court's opinion in *Monroe* v. *Pape*, 365 U. S., at 187–192, had not been advanced by respondent city of Chicago in that case. Indeed, the primary defense asserted on behalf of the city was that neither the city nor the individual detectives were liable because the officers' conduct was forbidden by Illinois law and therefore ultra vires. The city did not take issue with petitioners' submission that the doctrine of *respondeat superior* applied to the city. Compare Brief for Petitioners in *Monroe* v. *Pape*, O. T. 1960, No. 39, pp. 8, 21 ("The theory of the complaint is that under the circumstances here alleged the City is liable for the acts of its police officers, by virtue of *respondeat superior*"), and *id.*, at 25–27, with Brief for Respondents in *Monroe* v. *Pape*, O. T. 1960, No. 39, p. 3.

[5] Indeed, "by 1871, it was well understood that corporations should be treated as natural persons for virtually all purposes of constitutional and statutory analysis." *Monell*, 436 U. S., at 687. Moreover, "municipal corporations were routinely sued in the federal courts and this fact was well known to Members of Congress." *Id.*, at 688 (footnotes omitted). See, *e. g.*, *Louisville, C. & C. R. Co.* v. *Letson*, 2 How. 497, 558 (1844); see also *Cowles* v. *Mercer County*, 7 Wall. 118, 121 (1869).

[6] Thus William Blackstone wrote the following in 1765:

"As for those things which a servant may do on behalf of his master, they seem all to proceed upon this principle, that the master is answerable for the act of his servant, if done by his command, either expressly given, or implied: *nam qui facit per alium, facit per se*. Therefore, if the servant commit a trespass by the command or encouragement of his master, the master shall be guilty of it: not that the servant is excused, for he is only to obey his master in matters that are honest and lawful. If an inn-keeper's servants rob his guests, the master is bound to restitution: for as there is a confidence reposed in him, that he will take care to provide honest servants, his negligence is a kind of implied consent to the robbery; *nam, qui*

be held liable for the wrongful acts of his agents, even when acting contrary to specific instructions,[7] and the rule had been specifically applied to municipal corporations,[8] and to

*non prohibet, cum prohibere possit, jubet.* So likewise if the drawer at a tavern sells a man bad wine, whereby his health is injured, he may bring an action against the master: for although the master did not expressly order the servant to sell it to that person in particular, yet his permitting him to draw and sell it at all is impliedly a general command." 1 W. Blackstone, Commentaries *429–*430.

He continued in the same volume:

"We may observe, that in all the cases here put, the master may be frequently a loser by the trust reposed in his servant, but never can be a gainer: he may frequently be answerable for his servant's misbehaviour, but never can shelter himself from punishment by laying the blame on his agent. The reason of this is still uniform and the same; that the wrong done by the servant is looked upon in law as the wrong of the master himself; and it is a standing maxim that no man shall be allowed to make any advantage of his own wrong." *Id.*, at *432.

[7] In 1862, in *Limpus* v. *London General Omnibus Co.*, 1 Hurl. & C. 526, the Exchequer Chamber held that the owner of an omnibus company could be liable for injury inflicted on a rival omnibus company by a driver who violated the defendant's specific instructions. Judge Willes wrote:

"It is well known that there is virtually no remedy against the driver of an omnibus, and therefore it is necessary that, for injury resulting from an act done by him in the course of his master's service, the master should be responsible; for there ought to be a remedy against some person capable of paying damages to those injured by improper driving. . . . It may be said that it was no part of the duty of the defendants' servant to obstruct the plaintiff's omnibus, and moreover the servant had distinct instructions not to obstruct any omnibus whatever. In my opinion those instructions are immaterial. If disobeyed, the law casts upon the master a liability for the act of his servant in the course of his employment; and the law is not so futile as to allow a master, by giving secret instructions to his servant, to discharge himself from liability. Therefore, I consider it immaterial that the defendants directed their servant not to do the act. Suppose a master told his servant not to break the law, would that exempt the master from responsibility for an unlawful act done by his servant in the course of his employment?" *Id.*, at 539.

[8] See, *e. g.*, *Allen* v. *City of Decatur*, 23 Ill. 332, 335 (1860), where the court stated:

"Governmental corporations then, from the highest to the lowest, can commit wrongful acts through their authorized agents for which they are

the wrongful acts of police officers.[9]    Because it "is always appropriate to assume that our elected representatives, like other citizens, know the law,"[10] it is equally appropriate to

responsible; and the only question is, how that responsibility shall be enforced.    The obvious answer is, in courts of justice, where, by the law, they can be sued."

See also *Thayer* v. *Boston*, 36 Mass. 511, 516–517 (1837), where the court stated:

"That an action sounding in tort, will lie against a corporation, though formerly doubted, seems now too well settled to be questioned.    *Yarborough* v. *Bank of England*, 16 East, 6; *Smith* v. *Birmingham & Gas Light Co.*, 1 Adolph. & Ellis, 526.    And there seems no sufficient ground for a distinction in this respect, between cities and towns and other corporations.    *Clark* v. *Washington*, 12 Wheaton, 40; *Baker* v. *Boston*, 12 Pick. 184.

"Whether a particular act, operating injuriously to an individual, was authorized by the city, by any previous delegation of power, general or special, or by any subsequent adoption and ratification of particular acts, is a question of fact, to be left to a jury, to be decided by all the evidence in the case.    As a general rule, the corporation is not responsible for the unauthorized and unlawful acts of its officers, though done *colore officii;* it must further appear, that they were expressly authorized to do the acts, by the city government, *or that they were done bona fide in pursuance of a general authority to act for the city, on the subject to which they relate;* or that, in either case, the act was adopted and ratified by the corporation." (Emphasis added.)

In 1871, the year the Ku Klux Act was passed, *Thayer* was cited in support of the following statement:

"When officers of a town, acting as its agents, do a tortious act with an honest view to obtain for the public some lawful benefit or advantage, reason and justice require that the town in its corporate capacity should be liable to make good the damage sustained by an individual in consequence of the acts thus done." *Hawks* v. *Charlemont*, 107 Mass. 414, 417–418 (1871).

[9] In *Johnson* v. *Municipality No. One*, 5 La. Ann. 100 (1850), a Louisiana court affirmed a $600 damages judgment against a city for the illegal detention in its jail of the plaintiff's slave.    In the course of its decision, the court acknowledged the correctness of the following statement:

"The liability of municipal corporations for the acts of their agent is, as a general rule, too well settled at this day to be seriously questioned." *Ibid.*

[10] *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–697 (1979).

assume that the authors of the Civil Rights Act recognized that the rule of *respondeat superior* would apply to "a species of tort liability that on its face admits of no immunities."[11] Indeed, we have repeatedly held that § 1983 should be construed to incorporate common-law doctrine "absent specific provisions to the contrary."[12] We have consistently applied this principle of construction to federal legislation enacted in the 19th century.[13]

The legislative history of the Ku Klux Act supports this conclusion for two reasons. First, the fact that "nobody" objected to § 1[14] is consistent with the view that Congress expected normal rules of tort law to be applied in enforcing it.

---

[11] *Imbler* v. *Pachtman*, 424 U. S., at 417.

[12] The passage from which this language is taken is worth quoting in full: "It is by now well settled that the tort liability created by § 1983 cannot be understood in a historical vacuum. In the Civil Rights Act of 1871, Congress created a federal remedy against a person who, acting under color of state law, deprives another of constitutional rights. . . . One important assumption underlying the Court's decisions in this area is that members of the 42d Congress were familiar with common-law principles, including defenses previously recognized in ordinary tort litigation, and that they likely intended these common-law principles to obtain, absent specific provisions to the contrary." *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 258 (1981).

See also *Briscoe* v. *LaHue*, 460 U. S. 325, 330, 334 (1983); *Pierson* v. *Ray*, 386 U. S. 547, 553–554 (1967).

In *Newport*, the Court further noted:

"Given that municipal immunity from punitive damages was well established at common law by 1871, we proceed on the familiar assumption that 'Congress would have specifically so provided had it wished to abolish the doctrine.' *Pierson* v. *Ray*, 386 U. S., at 555. Nothing in the legislative debates suggests that, in enacting § 1 of the Civil Rights Act, the 42d Congress intended any such abolition." 453 U. S., at 263–264.

[13] See, *e. g.*, *Briscoe* v. *LaHue*, 460 U. S., at 330; *Associated General Contractors* v. *Carpenters*, 459 U. S. 519, 531 (1983).

[14] *Monroe* v. *Pape*, 365 U. S., at 171 (referring to § 1, which of course is now § 1983, Senator Edmunds, Chairman of the Senate Committee on the Judiciary, stated: "'The first section is one that I believe nobody objects to'").

Second, the debate on the Sherman Amendment—an amendment that would have imposed an extraordinary and novel form of absolute liability on municipalities—indicates that Congress seriously considered imposing *additional* responsibilities on muncipalities without ever mentioning the possibility that they should have any *lesser* responsibility than any other person.[15] The rejection of the Sherman Amendment sheds no light on the meaning of the statute, but the fact that such an extreme measure was even considered indicates that Congress thought it appropriate to require municipal corporations to share the responsibility for carrying out the commands of the Fourteenth Amendment.

Of greatest importance, however, is the nature of the wrong for which § 1983 provides a remedy. The Act was primarily designed to provide a remedy for violations of the United States Constitution—wrongs of the most serious kind.[16] As the plurality recognizes, the individual officer in this case was engaged in "unconstitutional activity."[17] But the conduct of an individual can be characterized as "unconstitutional" only if it is attributed to his employer. The Fourteenth Amendment does not have any application to purely private conduct.[18] Unless an individual officer acts under color of official authority, § 1983 does not authorize any recovery against him. But if his relationship with his employer makes it appropriate to treat his conduct as state action for purposes of constitutional analysis, surely that relationship

[15] *Monell*, 436 U. S., at 666–676.

[16] *Id.*, at 683–686.

[17] *Ante*, at 824.

[18] As the Court in *Shelley* v. *Kraemer*, 334 U. S. 1, 13 (1948), correctly noted:

"Since the decision of this Court in the *Civil Rights Cases*, 109 U. S. 3 (1883), the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful."

equally justifies the application of normal principles of tort law for the purpose of allocating responsibility for the wrongful state action.

The central holding in *Monroe* v. *Pape*, 365 U. S. 167 (1961), confirms this analysis. In that case, the city of Chicago had rested its entire defense on the claim that the individual officers had acted "ultra vires" when they invaded the petitioners' home.[19] Putting to one side the question whether the city was a "person" within the meaning of the Act, the only issue that separated the Members of the Court was whether liability could attach without proof of a recurring "custom or usage." In terms of today's decision, the question was whether it was necessary for the petitioners to prove that the conduct of the police officers represented the city's official "policy." Over Justice Frankfurter's vehement dissent,[20] the Court held that a "single incident" could constitute a violation of the statute.[21]

Justice Harlan's statement of the opposing positions identifies the central issue in *Monroe:*

> "One can agree with the Court's opinion that:
>
> "'It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies. . . .'
>
> "without being certain that Congress meant to deal with anything other than abuses so recurrent as to amount to 'custom, or usage.' One can agree with my Brother FRANKFURTER, in dissent, that Congress had no intention

---

[19] See n. 4, *supra.*
[20] 365 U. S., at 202–259.
[21] *Id.,* at 187.

of taking over the whole field of ordinary state torts and crimes, without being certain that the enacting Congress would not have regarded actions by an official, made possible by his position, as far more serious than an ordinary state tort, and therefore as a matter of federal concern." [22]

If the action of a police officer is "far more serious than an ordinary state tort" because it is "made possible by his position," the underlying reason that such an action is a "matter of federal concern" is that it is treated as the action of the officer's employer. If the doctrine of *respondeat superior* would impose liability on the city in an ordinary tort case, *a fortiori*, that doctrine must apply to the city in a § 1983 case.

## II

While the plurality purports to answer a question of statutory construction—which it properly introduces with a quotation of the statutory text, see *ante*, at 816—its opinion actually provides us with an interpretation of the word "policy" as it is used in Part II of the opinion in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 690–695 (1978). The word "policy" does not appear in the text of § 1983, but it provides the theme for today's decision.[23] The plurality concludes:

"Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved." [24]

---

[22] *Id.*, at 193 (Harlan, J., concurring).

[23] Notwithstanding the absence of the word "policy" in the statute, the plurality makes the remarkable statement that "custom or policy" is language that "tracks the language of the statute." *Ante*, at 818.

[24] *Ante*, at 823–824.

This parsimonious construction of the word "policy" may well be a fair interpretation of what the Court wrote in Part II of *Monell*, but I am persuaded that Congress intended no such bizarre result.

Part II of *Monell* contains dicta of the least persuasive kind. As JUSTICE POWELL noted in his separate concurrence, language that is "not necessary to the holding may be accorded less weight in subsequent cases."[25] Moreover, as he also pointed out, "we owe somewhat less deference to a decision that was rendered without benefit of a full airing of all the relevant considerations."[26] The commentary on *respondeat superior* in *Monell* was not responsive to any argument advanced by either party[27] and was not even relevant to the Court's actual holding.[28] Moreover, in the Court's earlier decision in *Monroe* v. *Pape*, although the petitioners had explained why it would be appropriate to apply the doctrine of *respondeat superior* in § 1983 litigation, no contrary argument had been advanced by the city.[29] Thus, the views expressed in Part II of *Monell* constitute judicial legislation of the most blatant kind. Having overruled its earlier—and, ironically also volunteered—misconstruction of the word "person" in *Monroe* v. *Pape*, in my opinion, the Court in *Monell* should simply have held that municipalities are liable for the unconstitutional activities of their agents that are performed in the course of their official duties.[30]

---

[25] *Monell*, 436 U. S., at 709, n. 6.

[26] *Ibid.*

[27] Compare Brief for Petitioners and Brief for Respondents in *Monell* v. *New York City Dept. of Social Services*, O. T. 1977, No. 75–1914, with the Court's dicta in Part II of *Monell*, 436 U. S., at 690–695.

[28] For that reason I did not join Part II of the opinion and did not express the views that I am expressing today. See 436 U. S., at 714 (STEVENS, J., concurring in part). Today the plurality deems it appropriate to characterize the discussion of *respondeat superior* as a "holding," see *ante*, at 818; thus one *ipse dixit* is used to describe another.

[29] See n. 4, *supra.*

[30] The plurality's principal response to this dissent is based on the doctrine of *stare decisis*. See *ante*, at 830, n. 5. That doctrine, however, does

## III

In a number of decisions construing § 1983, the Court has considered whether its holding is supported by sound considerations of policy.[31]  In this case, all of the policy considerations that support the application of the doctrine of *respondeat superior* in normal tort litigation against municipal corporations apply with special force because of the special quality of the interests at stake.  The interest in providing fair compensation for the victim,[32] the interest in deterring future violations by formulating sound municipal policy,[33] and the interest in fair treatment for individual

---

not apply to Part II of *Monell* because that part of the opinion was wholly irrelevant to the *ratio decidendi* of the case.  See *Carroll* v. *Lessee of Carroll*, 16 How. 275, 287 (1854); *Cohens* v. *Virginia*, 6 Wheat. 264, 399–400 (1821).  As is so often true, Justice Cardozo has provided us with the proper response:

"I own that it is a good deal of a mystery to me how judges, of all persons in the world, should put their faith in dicta."  B. Cardozo, The Nature of the Judicial Process 29 (1921).

[31] See, *e. g.*, *Newport* v. *Fact Concerts, Inc.*, 453 U. S., at 266–271; *Owen* v. *City of Independence*, 445 U. S. 622, 650–656 (1980).

[32] Cf. *Marbury* v. *Madison*, 1 Cranch 137, 163 (1803) ("The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.  One of the first duties of government is to afford that protection").

[33] As one observer stated:

"The great advantage of police compliance with the law is that it helps to create an atmosphere conducive to a community respect for officers of the law that in turn serves to promote their enforcement of the law. Once they set an example of lawful conduct they are in a position to set up lines of communication with the community and to gain its support." R. Traynor, Lawbreakers, Courts, and Law-Abiders, 41 Journal of the State Bar of California 458, 478 (July–August 1966).

See also *Owen* v. *City of Independence*, 445 U. S., at 652, n. 36 ("In addition, the threat of liability against the city ought to increase the attentiveness with which officials at the higher levels of government supervise the conduct of their subordinates.  The need to institute systemwide measures in order to increase the vigilance with which otherwise indifferent municipal officials protect citizens' constitutional rights is, of course, par-

officers who are performing difficult and dangerous work,[34] all militate in favor of placing primary responsibility on the municipal corporation.

The Court's contrary conclusion can only be explained by a concern about the danger of bankrupting municipal corporations. That concern is surely legitimate, but it is one that should be addressed by Congress—perhaps by imposing maximum limitations on the size of any potential recovery or by requiring the purchase of appropriate liability insurance—rather than by this Court. Moreover, it is a concern that is relevant to the law of damages rather than to the rules defining the substantive liability of "every person" covered by § 1983.[35]

The injection into § 1983 litigation of the kind of debate over policy that today's decision will engender can only complicate the litigation process. My rather old-fashioned and simple approach to the statute would eliminate from this class of civil-rights litigation the time-consuming "policy" issues that *Monell* gratuitously engrafted onto the statute. Of greatest importance, it would serve the administration of justice and effectuate the intent of Congress.

I respectfully dissent.

---

ticularly acute where the frontline officers are judgment-proof in their individual capacities").

[34] "A public servant who is conscientiously doing his job to the best of his ability should rarely, if ever, be exposed to the risk of damage liability." *Procunier* v. *Navarette*, 434 U. S. 555, 569 (1978) (STEVENS, J., dissenting).

[35] D. Dobbs, Handbook on the Law of Remedies 1 (1973) ("The law of judicial remedies concerns itself with the nature and scope of the relief to be given a plaintiff once he has followed appropriate procedure in court and has established a substantive right. The law of remedies is thus sharply distinguished from the law of substance and procedure").