**Angel LOPEZ, Plaintiff,**

**v.**

**Benjamin WARD; Otis Bantum; Sherri Kingston; Robert Keith; Kenneth Jameson; "Dr. Berman"; Richard Pankowitz, M.D.; Emanuel Wilkes, M.D.; Montefiore Hospital and Medical Center; City of New York, Defendants.**

**No. 85 Civ. 9195 (KC).**

United States District Court, S.D. New York.

Sept. 13, 1989.

See also 681 F.Supp. 192.

Thomas A. Curtis, Cleary, Gottlieb, Steen & Hamilton, for plaintiff.

Robin Binder, for defendants.

MEMORANDUM ENDORSEMENT

CONBOY, District Judge.

Plaintiff Angel Lopez brings this action pursuant to 42 U.S.C. § 1983, alleging that he was denied adequate medical treatment in violation of his constitutional rights while he was incarcerated at a correctional facility operated by the City of New York ("the City"). The defendants now move for summary judgment dismissing the complaint in its entirety.

The undisputed facts are as follows. From September 18 through September 24, 1982, Lopez was incarcerated in the House of Detention for Men ("HDM"), a correctional facility located on Rikers Island and operated by the Department of Correction of the City. Montefiore Hospital and Medical Center—Rikers Island Health Services ("Montefiore") provides medical care to inmates housed in HDM and other Rikers Island correctional facilities pursuant to a contract with the City. In September 1982, defendant Sherri Kingston and Robert Keith were both employed by Montefiore as physician's assistants and were assigned to work in the medical clinic at HDM. In September 1982, Kenneth Jameson was a physician's assistant employed by Montefiore on a *per diem* basis.

On Friday, September 17, 1982, plaintiff was transferred to HDM from another facility on Rikers Island where he had completed a methadone detoxification program. Plaintiff was housed in Unit 1–B of the punitive segregation area of HDM. On Saturday, September 18, 1982, plaintiff complained that he had fainted and banged his head while in his cell. Later that day, while making daily sick-call rounds in Unit 1–B, Jameson visited Lopez, at which time Lopez complained of a vision problem in his right eye. Jameson examined plaintiff's eye and prepared a consultation request asking that an ophthalmologist examine plaintiff further. A consultation request is a form that is completed by a medical practitioner when he or she thinks that an inmate should be seen by a specialist or be evaluated in a hospital emergency room. On Wednesday, September 22, 1982, plaintiff complained of a vision problem to Keith, who was making sick-call rounds that day. Keith examined plaintiff's eye and prepared a consultation request referring plaintiff to an ophthalmologist for further evaluation. On Friday, September 24, 1982, an ophthalmologist employed by Montefiore diagnosed plaintiff as having a detached retina. Lopez was transferred to Bellevue hospital for surgery to repair the retinal detachment, but he nonetheless suffered a permanent loss of vision in his right eye. At some point before or after his hospitalization, Kingston visited Lopez in his cell and apologized to him, stating that she was sorry his eye condition had not been diagnosed sooner.

Plaintiff claims that Kingston visited him in his cell sometime between the 18th and the 24th of September and heard his complaints, but ignored them. Plaintiff also claims that the delay in his treatment was the result of a City policy or custom of deliberate indifference to the medical needs of HDM inmates.

KINGSTON

■ To prevail on his constitutional claim against defendant Kingston, plaintiff must establish that she was deliberately indifferent to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Archer v. Dutcher,* 733 F.2d 14, 15 (2d Cir.1984). An action under Section 1983 is not the equivalent of a medical malpractice suit, and mere improper or inadequate medical care will not support recovery. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291; *Archer,* 733 F.2d at 15. Thus, it is clear that Lopez's claim against Kingston stands or falls on whether there is any evidence from which a reasonable juror could conclude that she was told by plaintiff of his vision problems *and* that she failed to take any steps to ensure proper treatment. Defendants have submitted the following evidence on this issue.

Kingston has no independent recollection of visiting Lopez at any time prior to his hospitalization, but Montefiore's medical records, including entries made by Kingston in log books, reflect the following interactions between Lopez and Kingston prior to the 24th. On September 20, while conducting medical rounds in Unit 1–B, Kingston visited Lopez and recorded his complaint that he had not received his cold medication. Kingston again visited Lopez on the 21st, at which time he complained to her about bronchitis. In response to his complaints, she referred him to the medical clinic at HDM. Although Kingston might have reviewed Lopez's medical chart on either day, the chart would not have revealed Lopez's eye complaints to Jameson on the 18th because Jameson, for unknown reasons, made no entries for that day. Kingston does remember, and the hospital's records confirm, that she saw Lopez and treated his eye problems several times *after* he returned from the hospital, but the records do not confirm Lopez's allegation that Kingston heard complaints about his eye problems between the 18th and the 24th.

According to plaintiff's counsel, the hospital's records are contradicted by Lopez's testimony that Kingston "saw him, that he told her about his eye, and that she disregarded his requests for help," sometime during the week of the 18th. Plaintiff's Memorandum of Law at 14. Not only is this assertion not supported by Lopez's testimony, but is flatly contradicted by it. Lopez did testify that he was examined by Kingston in his cell, and that he described his eye problems to her, but with respect to the critical issue of her reaction to his complaints, Lopez testified as follows:

> She told the CO to open my cell door and she went in her bag and she took out the light that you look in the eye. She looked in my left eye, and then she looked at my right eye. And she, and I quote her, quote, "I don't think there is enough light here because I can see in the left eye but I can't see nothing in the right eye." *She asked the CO, can he have somebody escort me to the clinic? The CO said it was about time, I quote him, and I was handcuffed again and brought to HDM, the clinic.*

Lopez Tr. at 43–44 (emphasis added). Lopez goes on to describe his treatment by a doctor Ling (or Lee) at the clinic.

Drawing all inferences in Lopez's favor, and giving him the benefit of the doubt that he is not confusing Kingston's pre-September 24th visits with those after, his testimony directly and unequivocally refutes his claim that Kingston failed to act on his complaints.[1] Accordingly, the complaint as against her is dismissed.

## THE CITY

Assuming, arguendo, that plaintiff could establish that Kingston and/or others were deliberately indifferent to his serious medical needs, he must, to prevail against the City, prove "a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation." *City of Canton v. Harris,* — U.S. —, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). If a municipal policy or custom is not itself unconstitutional, "*considerably more proof* than [a] single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma v. Tuttle,* 471 U.S. 808, 824, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (emphasis added). Finally, to prevail on a claim that the City is liable for a constitutional wrong because it failed to train its employees properly, the plaintiff must establish that the "failure to train reflects deliberate indifference to the constitutional rights of [the City's] inhabitants." *City of Canton,* 109 S.Ct. at 1206.

1. Plaintiff's belatedly submitted affidavit, wherein he asserts that Kingston visited him and was told about his eye problems at least one time between his injury and his hospitalization, is in no way inconsistent with his deposition testimony that she promptly sought treatment for him at the clinic. The affidavit clearly skirts any accusation that Kingston failed to act in response to his complaints.

The essence of plaintiff's claim against the City appears to be that it has a "no blood, no emergency" policy: that is, any injury or condition that does not involve serious bleeding or other life threatening symptoms is, as a rule, not considered an emergency. This assertion is based principally on the testimony of Kingston that an "emergency" would have to involve "loss of breathing, loss of circulation, bleeding that could not be stopped with pressure." Kingston Tr. at 15. In rejecting this argument, I note first that Kingston's testimony is taken out of context, since she immediately qualified the observation by stating that the aforementioned conditions were just "some examples" of emergencies. More importantly, when asked explicitly whether she would consider a detached retina an emergency, she answered in the affirmative. Keith also testified that he would consider several types of eye injuries to be emergencies, and he described several specific symptoms of a detached retina which, if observed, would require immediate consultation with an ophthalmologist. Thus, plaintiff's "no blood, no emergency" allegation is clearly without support in the record.[2]

Lopez was not denied immediate treatment because of an isolated decision that a detached retina was not an urgent condition, let alone a policy or custom to that effect, but because Keith and Jameson neither knew nor even suspected, based on their examinations on the 18th and the 22nd, that Lopez had a detached retina. See Plaintiff's Memorandum at 10–11. In response to Lopez's complaints about blurry vision, Jameson tested the eye for responsiveness to light and movement. The eye reacted normally to both. Because Jameson could not see the fundus—the back of the eye—due to lighting conditions,

he filled out a request for a consultation with an ophthalmologist. Jameson did *not* indicate on the consultation request that he suspected any particular condition, nor did he indicate that Lopez required immediate treatment or even a prompt consultation. Jameson simply requested an evaluation by a specialist. Although Keith was concerned, based on Lopez's subjective symptoms on the 22nd, that Lopez might have an eye abnormality of some kind, Keith could not make a specific diagnosis.[3] Accordingly, he requested that an ophthalmologist evaluate Lopez to "rule out pathology." Although the parties appear to be confused on the point, Keith did not even write "stat"—which would indicate the need for priority evaluation—on the consultation request filled out on the 22nd. The word "stat" appears only in the entry Keith made on Lopez's medical chart.

The record is equally unsupportive of plaintiff's alternative allegation that the failure of Jameson and Keith to get immediate treatment for the retinal detachment demonstrates an "abysmal" lack of proper training for physician's assistants. Plaintiff has introduced no evidence that Jameson and Keith's assessment of Lopez's condition was, on the evidence that was available to them, in any way inadequate or negligent, let alone to such a degree as to suggest a deliberate indifference to inmates' serious medical needs.

The only arguable inadequacies of any kind in Lopez's treatment were the apparent inept or incomplete processing of Jameson's September 18th consultation request, and the two day delay between Keith's consultation request and Lopez's examination. But even if an inference can be drawn from one or both of these incidents that someone was deliberately indifferent to Lopez's medical needs—and that is a

2. Nor does it necessarily follow that a condition not considered an "emergency" as that term is used by the medical staff at HDM would not receive prompt treatment. Before the topic of "emergencies" came up in her deposition, Kingston discussed "serious injuries" which "could be severe trauma with or without bleeding, with or without breathing, with or without circulation, with or without broken bones." Kingston Tr. at 15. There is nothing in the record to

suggest that "serious injuries" are treated in a leisurely or lackadaisical manner.

3. During his deposition, Keith declined counsel's characterization of his diagnosis as a definite finding that "something was seriously wrong," with Lopez. Keith testified that there was merely "a potential for something that required an immediate evaluation."

very big if on this record—nothing in the record supports the conclusion that these procedural delays were the product of a City policy or custom. It is not argued here that the procedures for processing consultation requests at HDM are inherently inadequate, and the testimony of Keith, Jameson, and Kingston reflects their complete familiarity with such procedures. With respect to the delay between Keith's request and the consultation, Keith testified that he would not normally expect a delay of even one day following a request for an immediate consultation. Thus, even assuming Keith had indicated a need for prompt attention on the consultation request, there is no evidence that the delays were anything more than isolated instances of neglect.

To demonstrate that his treatment or lack thereof was part of a larger pattern of neglect, plaintiff has introduced medical records indicating, according to him, that in four separate cases where inmates needed ophthalmological examinations, the treatment time ranged from approximately two weeks to over six weeks. In three other cases, plaintiff asserts, "it is unclear that the prisoners were ever seen at the clinic." Plaintiff's Memorandum at 11. Defendants have submitted a reply affidavit explaining each case, and in some instances indicating that the inmates were treated promptly, contrary to plaintiff's allegations. It is unnecessary to consider this affidavit, however, since the evidence submitted by plaintiff—consisting largely of a series of sketchy consultation requests—is completely uninformative regarding the nature and seriousness of each inmate's condition, the degree of urgency if any in each case, and the timeliness of treatment. Without such information, the records are simply not probative of the general adequacy of eye care at HDM.[4]

Accordingly, defendants' motion for summary judgment dismissing the complaint is granted, and the Clerk of the Court is directed to enter judgment in favor of the defendants.

SO ORDERED.

---

4. In some instances, plaintiff flatly mischaracterizes the evidence. For example, plaintiff offers an "Injury to Inmate" form for an inmate named Octavis Cambell. The top half of the form indicates that Cambell suffered an eye injury on February 8, 1982. According to plaintiff, "no record of any treatment was provided in discovery." The bottom half of the same form, however, was filled out by the medical staff on the same day the injury report was submitted, setting forth the nature of Cambell's injury and the treatment provided.