**James P. DAVIS, Jr., Plaintiff,**

v.

**CITY OF UPPER ARLINGTON, OHIO, et al., Defendants.**

No. C2–89–281.

United States District Court, S.D. Ohio, E.D.

Aug. 23, 1990.

James P. Davis, Jr., pro se.

Keith Sommer, Martins Ferry, Ohio, and Anthony Hartman, Cleveland, Ohio, for defendants.

ORDER AND OPINION

GEORGE C. SMITH, District Judge.

This matter is before the Court pursuant to Defendant City of Upper Arlington's ("Upper Arlington"), and Defendant TransOhio Savings Bank's ("TransOhio") respective motions for dismissal or in the alternative for summary judgment. These motions are brought pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative, Rule 56. Because both movants have elected to attach sworn statements to their motions this Court may not properly consider the motions under Rule 12(b)(6). *See, e.g., Rose v. Bartle,* 871 F.2d 331 (3rd Cir.1989); *Washington v. Office of the Comptroller of the Currency,* 856 F.2d 1507 (11th Cir.1988); *Tanner v. Heise,* 879 F.2d 572 (9th Cir.1989). Therefore, each motion shall be treated and addressed as a Motion for Summary Judgment pursuant to Fed.R.Civ.Pro. 56.

This action was filed by Plaintiff James P. Davis, Jr. ("Davis") on March 29, 1989, as a *pro se* litigant. The Complaint alleges that actions perpetrated by Defendants Upper Arlington and TransOhio on November 10, 1987, were in violation of Title 42 U.S.C. § 1983, based upon false arrest, excessive force and the alleged deprivation of his property. Davis also brings pendant jurisdictional tort claims sounding in defamation, intentional infliction of emotional distress and negligent infliction of emotional distress against TransOhio.

## FACTS

In the late morning of November 10, 1987, the plaintiff entered the TransOhio Savings Bank located in Upper Arlington, Ohio. Mr. Davis did not have an account at the bank, however, he wished to purchase two Certificates of Deposit ("CDs"). Mr. Davis' deposition provides that upon entering the bank and requesting the purchase of the CDs, he was directed to the assistant manager of the bank. The assistant manager informed him that she could assist him in purchasing the CDs. Mr. Davis took a seat at her desk and proceeded to exchange small talk with the assistant manager while she was preparing the requisite forms. Apparently, based upon Mr. Davis' appearance, his comments, his possession of a briefcase, or some other factors, the assistant manager profiled the plaintiff as a bank robber and sounded the silent alarm. Upon the arrival of the police officers the assistant manager apparently, "threw up her arms, screamed and said, 'Oh, no, not again,' and put her hand to her head and run (sic) outside the door." (Plaintiff's deposition at p. 11, attached as Exhibit C to Defendant Upper Arlington's motion).

The plaintiff walked out of the bank with his briefcase and as he did so, he reached into his jacket pocket. An officer immediately told Mr. Davis, "Don't pull your hand out of that pocket." The officer then immediately rushed around the "suspected bank robber", Mr. Davis, and grabbed his arm from behind, and according to Mr. Davis' deposition, the officer stated, "I've got him. Here he is." (See deposition at p. 22).

Mr. Davis alleges that the officers proceeded to fasten the handcuffs so tight that it took two police officers to later release them. He further alleges that the officers threw him into the back of a cruiser with excessive force, which twisted his right ankle and placed his knee in a painful position under the cruiser's partition. Mr. Davis did not seek, nor has he claimed the need for medical attention for his knee, ankle or wrists.

Once it was determined that Mr. Davis had not intended to rob the bank, he was immediately released. He was in custody approximately thirty (30) minutes. Mr. Davis then simply returned to his home. At some later time, Mr. Davis attempted to retrieve from the bank the checks he had planned to use to purchase the CDs. He states that it took three days before he received the checks by picking them up at the Upper Arlington police station. Mr. Davis, as part of his Complaint, asks for the lost interest on those three days.[1]

## STANDARD OF REVIEW

In considering this motion, the Court is mindful that the standard for summary judgment "mirrors the standard for a directed verdict under [Rule 50(a)], which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), citing *Brady v. Southern Ry. Co.,* 320 U.S. 476, 479–480, 64 S.Ct. 232, 234–235, 88 L.Ed. 239 (1943). Thus, the Supreme Court concluded in *Anderson* that a judge considering a motion for summary judgment must "ask himself not whether

---

1. It is noteworthy that the Court was informed pursuant to a Suggestion of Death on the Record filed on March 19, 1990, by Attorney Jonathan M. Jackson, (making a special appearance for the purpose of the above referenced filing only), that the plaintiff, James P. Davis, Jr., died on March 11, 1990. The defendants have filed a joint motion for dismissal, based upon the plaintiff's failure, obviously by and through counsel, to comply with Rule 25 of the Federal Rules of Civil Procedure. Essentially, the motion argues that the filing by Attorney Jackson was merely a "Suggestion", and not a "Motion for Substitution" as required by Rule

25. Rule 25 provides in relevant part as follows:

... Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.

Upon this basis, in and of itself, the Court could rid its docket of this matter, however, in the interest of justice, rather than docket control, this Court will pass on addressing this issue.

he thinks the evidence unmistakably favors one side or the other but whether a fair minded jury could return a verdict for the plaintiff on the evidence presented." 477 U.S. at 252, 106 S.Ct. at 2512.

■ Rule 56(c) of the Federal Rules of Civil Procedure provides in relevant part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

In essence, the inquiry is whether the evidence presented a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

■ Such an inquiry necessarily implicates the evidentiary standard of proof that would apply at the trial on the merits. As a result, the Court must view the evidence presented through the prism of the substantive evidentiary burden. Rule 56(e) therefore requires that the nonmoving party go beyond the pleadings and by their own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish an element to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552.

In *Banks v. Rockwell International N. Am. Aircraft Operations*, 666 F.Supp. 1053 (S.D.Ohio 1987) (J. Graham), this district enunciated the importance of granting summary judgments in appropriate situations stating that, "[a]lthough summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed to secure the just,

speedy and inexpensive determination of every action." *Citing Celotex Corp v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553, (quoting Fed.R.Civ.Pro. 1); *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

Thus, the mere existence of a scintilla of evidence in support of a plaintiff's claim is insufficient—there must be evidence upon which a jury could reasonably find for the plaintiff. Having discussed the Rule 56 standard of review, the Court now turns to the merits.

## ANALYSIS

In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the United States Supreme Court held that municipalities are "persons" subject to damages liability under § 1 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1983, for violations of that Act visited by municipal officials. However, for our purposes, the Court noted that municipal liability could not be premised on the mere fact that the municipality employed the offending official. Instead, the Court held that municipal liability could only be imposed for injuries inflicted pursuant to government "policy or custom." *Id.*, at 694, 98 S.Ct. at 2037, *see also, Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

The fact pattern in *Oklahoma City v. Tuttle* is very similar to that found in the instant case. In *Oklahoma City v. Tuttle*, a police officer shot and killed Albert Tuttle, believing Mr. Tuttle was about to pull a weapon. The officer who had been on the force for about 10 months, had responded to an all points bulletin indicating that there was a robbery in progress at the We'll Do Club, a bar in Oklahoma City. The bulletin was the product of an anonymous telephone call. The caller had reported the robbery in progress, gave a description of the robber, and reported that the robber had a gun. It was later stipulated at trial that Mr. Tuttle himself had placed the anonymous call. The officer that shot Mr. Tuttle was the first officer to arrive at the scene. Upon arriving, he entered the bar. The officer claims he was approached

by Mr. Tuttle, at which time the officer grabbed his arm and requested he stay within the bar. This treatment was due to the fact that Mr. Tuttle matched the description of the robber. The officer began questioning the barmaid to determine if in fact a robbery was in progress. Again, the officer was forced to restrain Mr. Tuttle from leaving the bar by grabbing his arm. Mr. Tuttle broke away from the officer's grip, and ignoring the officer's command to "halt", he exited the bar. The officer followed Mr. Tuttle outside and observed Mr. Tuttle, once outside, appear to crouch down and reach into his boot. The officer again ordered Mr. Tuttle to halt, believing that the suspect was reaching for a weapon, however the order was again ignored. As Mr. Tuttle began to come out of his crouch the officer discharged his weapon. It was later determined that Mr. Tuttle had a toy pistol in his boot.

Mr. Tuttle's widow brought suit in the United States District Court under § 1983, against the officer and the city. The jury returned a verdict against the city. The Supreme Court in addressing that case was specifically interested in whether one incident of unconstitutional activity could give rise to a finding that the municipality had adopted or could be held liable as having an unconstitutional policy. The instant matter does not even get that far. The plaintiff in the instant suit failed to even argue a theory of the municipality having "adopted" a "policy" of "inadequate training" of its police officers. Instead, it would appear the plaintiff is relying on a *respondeat superior* theory. In *Monell, supra,* and again in *Oklahoma City v. Tuttle,* the Court has reiterated that such a theory will not hold a municipality liable. *Oklahoma City v. Tuttle,* 471 U.S. at p. 818, 105 S.Ct. at 2433. The Court noted that they earlier held in *Monell* that "§ 1983 only imposes liability for deprivations 'cause[d]' by a particular defendant, and that it was hard to find such causation where liability is imposed merely because of an employment relationship." *Id.* In summation the Court again found that "only deprivations visited pursuant to mu-nicipal 'custom' or 'policy' could lead to municipal liability." *Id.*

In application to the instant matter it becomes clear that the plaintiff's arguments are precluded by *Monell, supra; Oklahoma City v. Tuttle, supra;* and their progeny. Therefore, Defendant Upper Arlington's Motion for Summary Judgment is hereby GRANTED. Without the federal jurisdiction incumbent in a 42 U.S.C. § 1983 claim there is no longer pendent jurisdiction for the tort claims set against Trans-Ohio. While the United States Supreme Court held in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), that the federal courts do have the power to exercise pendent jurisdiction over state law claims when the state and federal claims derive from a common nucleus of operative fact, the Court clearly recognized that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Id.* at 725–26, 86 S.Ct. at 1138–39.

With that in mind, this Court does not elect to retain the case in this Court as the State Court is the proper forum. Therefore, Defendant TransOhio's Motion for Summary Judgment is DENIED as MOOT, however the matter as it relates to Trans-Ohio is DISMISSED without prejudice as it no longer has jurisdiction in this Court.

IT IS SO ORDERED.