Kamal JAVID and Eleanor Javid, individually, and Eleanor Javid as Administratrix of the Estate of Tige Javid, Deceased, Plaintiffs,

v.

Edward SCOTT and The Village of Monroe, Defendants.

No. 92 Civ. 4476 (WCC).

United States District Court, S.D. New York.

Jan. 19, 1996.

Order Dismissing Discontinued Claims March 4, 1996.

Robert N. Isseks, John S. McBride, Goshen, New York, for Plaintiffs; Robert N. Isseks, of counsel.

Thurm & Heller, New York City, for Defendants; Richard S. Sklarin, of counsel.

CONNER, Senior District Judge:

Plaintiffs Eleanor Javid, as administratrix of the estate of Tige Javid ("Javid"), deceased, and Kamal Javid and Eleanor Javid (Javid's parents), individually, brought this action pursuant to 42 U.S.C. § 1983, alleging that defendant Edward Scott ("Scott") violated their constitutional rights by the use of deadly force in apprehending Javid, and that defendant Village of Monroe (the "Village") had a policy of inadequately screening, training and supervising police officers. Plaintiffs also asserted common law tort claims against Scott for assault, battery and wrongful death, and against the Village under the theory of respondeat superior.

Defendants have moved for summary judgment dismissing plaintiffs' claims on grounds that (1) Scott's actions are shielded by qualified immunity because his use of deadly force was "objectively reasonable" as a matter of law, and (2) plaintiffs have not set forth a valid section 1983 claim against the Village. For the reasons discussed below, defendants' motion with respect to the claims asserted against Scott is denied, and consideration of defendants' motion with respect to the claims asserted against the Village is deferred pending further opportunity for discovery.

*BACKGROUND*

This claim arises out of the fatal shooting of Javid during the early morning hours of May 30, 1992 following a high speed chase involving numerous police agencies in Orange County, New York. The pursuit stretched several miles before Scott, a police officer employed by the Village of Monroe during times relevant to this case, terminated the chase by shooting Javid while in pursuit in his police cruiser. Scott was acquitted of manslaughter charges after trial before the Honorable Jeffrey G. Berry, Orange County Court Judge, in connection with the events of May 30, 1992. During the trial, Scott gave sworn testimony on his own behalf on Octo-

ber 27, 1993, and was subject to cross examination by the Orange County District Attorney's Office.

Most of the facts surrounding the chase are not in dispute. Beginning at 11:00 p.m. on May 29, 1992, Scott was on duty during the 11:00 p.m. to 7:00 a.m. shift as a uniformed police officer in a marked Village of Monroe Police Department patrol cruiser. At some point prior to 3:00 a.m. on May 30, 1992, Scott received a dispatch over the police radio that a robbery had just occurred several miles away in the Village of Goshen involving a suspect driving a red pick-up truck. Scott testified in his criminal trial that the dispatcher stated that the suspect was believed to be armed. After hearing this radio transmission, Scott drove to the entrance ramp between Exits 129 and 130 of Route 17. Shortly thereafter, Scott observed two marked New York State Trooper vehicles proceeding on Route 17 immediately followed by a radio communication from State Trooper Casey that he would advise when the Village of Monroe police officers should get into position for a moving road block. Pursuant to Trooper Casey's direction, Scott and Officer Bieber, the other Village of Monroe officer on duty during the shift, started their moving road block on Route 17. After getting into position, Scott observed emergency lights on top of police vehicles in his rear view mirror travelling at a high rate of speed in pursuit of one vehicle operating without emergency lights. This vehicle was a red Ford Bronco pick-up truck driven by Javid.

As Scott began accelerating to create a moving road block, the Javid vehicle passed him on the right side of his patrol vehicle in the merging lane, followed by one of the other emergency police vehicles. Scott testified in his criminal trial that, during the chase, he heard another police broadcast stating that the suspect was armed.

Throughout the chase, the red pick-up truck was swerving back and forth in an attempt to prevent anyone from passing on either side. Defendants claim that Scott believed that Javid had a gun, based on the police dispatches and a "bang" that he heard as Javid ran a police vehicle off the road during the chase. Scott then took out his

gun and, placing it outside his drivers side window, began firing his gun from "close combat range" (15 to 25 feet) at the Javid vehicle, purportedly aiming for the rear tires of the truck. After an uncounted number of rounds were fired, one of the shots found its mark and punctured the left rear tire of Javid's vehicle. Scott transmitted on his police radio that he believed he had gotten the tire. Scott placed his gun under his thigh as the tire went flat.

Even with the flat tire, Javid continued to lead the chase down Route 17, colliding with police vehicles that were attempting to execute moving road blocks. At some point, the left rear tire fell off completely, so that the truck was running on the rim of the left rear wheel. Defendants allege that Scott then heard an additional radio transmission: "Woodbury be advised weapon involved...."

The Javid vehicle entered the Exit 131 ramp with Scott in pursuit. Javid made a right-hand turn at the intersection of Route 32. Scott followed onto Route 32 and removed his gun from under his thigh. Javid made a wide right turn onto Route 6, and Scott still followed. Scott then entered the oncoming lane of traffic on Route 6 in an attempt to pass the red pick-up truck. Scott had his weapon in his right hand as he drew even with Javid. Defendants claim that Scott observed Javid look at him, turn quickly to his right, and turn back facing Scott as the red pick-up truck came directly towards Scott's vehicle. Defendants claim that Scott believed that Javid was reaching for a gun. Scott then fired his weapon once and observed the driver's side window break. The bullet struck Javid in the side. The red pick-up truck slowed to a stop; Javid exited the vehicle and dropped to the ground. Scott slowed his vehicle to a stop some distance in front of Javid.

Other officers involved in the chase caught up to the scene and arrested Javid. One of the officers immediately noticed that Javid was bleeding, and he called for an ambulance. Emergency personnel arrived within minutes and transferred Javid to a hospital. Efforts to save Javid's life were to no avail. Scott's pursuit of the red pick-up truck lasted over four miles and reached speeds as high as 105 miles per hour.

## DISCUSSION

### I. Summary Judgment

On a motion for summary judgment, a court must decide if a genuine issue of material fact exists. Civ.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Clearly, the facts and circumstances surrounding Scott's use of deadly force constitute material facts, and there are genuine issues to be tried before a jury. We therefore deny summary judgment on claims against Scott.

Plaintiffs offer no evidence to support their claim that the Village had a policy or custom of inadequately screening, training and supervising officers, and that such policy directly caused the alleged constitutional violation. Defendants move for summary judgment on the claim against the Village, arguing that a single incident of an alleged constitutional violation by an officer cannot alone support a claim of a policy or custom on the part of the Village. However, because discovery has not been completed, we grant plaintiffs a limited extension of time to complete discovery in order to determine if their claim against the Village can be supported by evidence of a policy or custom on the part of the Village that directly caused the alleged constitutional violation.

### II. Section 1983 Excessive Force Claim Against Scott

As a general rule, police officers are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. *Oliveira v. Mayer,* 23 F.3d 642, 648 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995). There can be no dispute that freedom from the use of excessive force is a clearly established constitutional right. The issue is whether it was objectively reasonable for Scott to believe that his acts did not violate Javid's constitutional right to be free from the use of excessive force. At the time that Javid was shot, a reasonably prudent officer would have recognized that an officer could use deadly force to effect the

arrest of a fleeing felon if, under the circumstances, he reasonably believed such force was necessary to protect himself or others from death or serious physical harm. *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). Excessive force claims under section 1983 are governed by the Fourth Amendment standard of "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)[1]; *Finnegan v. Fountain*, 915 F.2d 817, 823 (2d Cir.1990). *See also Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) ("[T]here can be no question that the apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.")

### A. Objectively Reasonable Standard

The Supreme Court has set forth several principles in holding that an excessive force claim is to be analyzed under an "objectively reasonable" standard of the Fourth Amendment:

The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation....

As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.... An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

■ Proper application of the test of reasonableness under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872.

■ Defendants invoke the qualified immunity doctrine and urge that, as a matter of law, a reasonably prudent officer in Scott's position would have believed that his actions were permissible. While the reasonableness of Scott's actions are subject to an objective standard, the objective test for reasonableness is based upon facts and circumstances surrounding the events that gave rise to the decision to exercise deadly force. Though "[i]mmunity ordinarily should be decided by the court," *see Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991), that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury con-

1. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), ruled that an excessive force claim should be analyzed under the Fourth Amendment "objectively reasonable" standard, rather than the Fourteenth Amendment substantive due process standard. Therefore, we reject Javid's substantive due process claim and apply a Fourth Amendment "objectively reasonable" analysis to the excessive force claim. However, Javid's parents individually assert a substantive due process claim that is distinct from Javid's substantive due process claim. *See Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir.1991) ("While the person who claims excessive force was directed at him or her can only raise a fourth amendment claim, a parent who claims loss of the companionship and society of his or her child, or vice versa, raises a

different constitutional claim. The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child...."), *cert. denied*, 506 U.S. 972, 113 S.Ct. 460, 121 L.Ed.2d 369 (1992). Therefore, we recognize that Javid's parents, as individual plaintiffs, may have a viable substantive due process claim under the Fourteenth Amendment. Defendants address only the excessive force claim asserted by Javid, possibly assuming that a finding of objectively reasonable use of force would be a complete defense in this action. For the purpose of deciding this motion, we analyze Javid's excessive force claim under the objectively reasonable standard of the Fourth Amendment.

sideration is normally required, *see, e.g., Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *see also Hurlman v. Rice,* 927 F.2d 74, 78 (2d Cir.1991). "Of course, as with any issue of nominally disputed fact, if the state of the evidence is such that reasonable jurors could reach only one conclusion, then that factual issue is appropriate for decision by the court as a matter of law." *Oliveira,* 23 F.3d at 649. Thus, the question is whether, viewing the evidence in the light most favorable to plaintiffs, a jury could reasonably conclude that it was not objectively reasonable for defendant Scott to have believed that his action was lawful. *See id.* The key facts are what Scott *saw* Javid do, not what Scott *believed* Javid was about to do. We find that there are genuine issues of material fact as to the facts and circumstances that existed at the time of the fatal shooting.

## B. Genuine Issue of Material Fact

■ Defendants argue that "undisputed facts" derived from Javid's testimony at his criminal trial for manslaughter establish, as a matter of law, that Scott's actions were "objectively reasonable" and therefore shielded by qualified immunity. As the argument goes, because Scott invoked the Fifth Amendment privilege against self-incrimination at his deposition, and because he will invoke the privilege at trial, the "undisputed facts" from Scott's criminal trial testimony are all the relevant facts that will be available. Defendants' logic is riddled with unfounded assumptions and conclusions.

As a preliminary matter, we have not ruled on whether the Fifth Amendment privilege is even available to Scott. The issue has never been raised by the parties before this court.

Scott already has been tried and acquitted of manslaughter in State Court in connection with the fatal shooting of Javid. Defendants have identified no potential criminal liability to which Scott could be exposed by his testimony at trial or at deposition.

The "undisputed facts" submitted by defendants are those given by defendant Scott in his testimony at his criminal trial for the fatal shooting of Javid. If Scott testifies at trial, the jury will decide the facts and circumstances of the chase and of the crucial moment when Scott shot Javid. Based on these facts and circumstances, the jury must decide whether Scott's actions were "objectively reasonable."

Scott claims that he saw certain things which could have caused a reasonably prudent officer to believe that he was justified in exercising deadly force. Scott testified that, during the chase, he saw what he thought was a gun. However, Scott testified that, just prior to shooting Javid, he saw Javid look at him, then turn away, then look at him again as the truck came towards him. Whether Scott *subjectively* believed that Javid was about to shoot him is irrelevant. The relevant inquiry is how a reasonably prudent officer would have acted based on those facts and circumstances. Facts and circumstances include what Scott saw and heard, not what Scott believed. The jury should decide (1) what Scott saw prior to shooting Javid, and (2) whether Scott's actions, based on what he saw, were objectively reasonable (i.e., whether a reasonably prudent officer would have acted similarly).

■ Even assuming, *arguendo,* that Scott could invoke the Fifth Amendment privilege at trial, a jury may draw a negative inference from Scott's refusal to answer questions regarding what took place during the chase.[2] A reasonable jury may discount

---

**2.** *See Brink's, Inc. v. City of New York,* 717 F.2d 700, 707 (2d Cir.1983):

One commentator ... notes that it is unfair to prevent a jury from drawing inferences against defendants when they ... exercise a privilege. Heidt, The Conjurer's Circle: The Fifth Amendment Privilege in Civil Cases, 91 YALE L.J. 1062, 1087–88, 1107–35 (1982). At the very least, Professor Heidt suggests, the plaintiff's attorney should be allowed to inform the factfinder of the invocation of privilege without having to call the invoker to the stand.... Overall, we are inclined to agree ... that ...

claims of privilege were admissible and competent evidence under the circumstances of this case, given the fact there is no constitutional mandate ... against their admission. But our inquiry is not ended. We still must determine whether the trial court was correct in concluding that the probative value of the evidence was not "substantially outweighed by the danger of unfair prejudice" under Fed. R.Evid. 403. This balancing test [is] left largely to the discretion of the trial judge. [*United States v. Robinson,* 560 F.2d 507, 514–15 (2d Cir.1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978) ].

the accuracy of Scott's testimony (from the criminal trial) regarding the facts and circumstances of the chase. If the jury does not believe that testimony, a jury may reasonably conclude that no reasonably prudent officer would have believed that he or she was justified in using deadly force. We will not permit Scott to invoke the Fifth Amendment to shield himself from examination while offering his self-serving statements as the only available evidence relevant to his asserted justification for the use of deadly force.

### C. Common Law Tort Claims

Plaintiffs' Amended Complaint includes a reference to common law tort claims of assault, battery, and wrongful death against Scott. *See* Am.Compl. ¶ 3 ("This Court's supplemental jurisdiction is also invoked to assert the plaintiffs' claims against the defendants of the torts of assault and battery and wrongful death under the common law of the State of New York."). Yet, in the Statement of Claims, plaintiffs do not specifically assert any common law tort claims. Nevertheless, under the liberal pleading rule of Rule 8 of the Federal Rules of Civil Procedure, we conclude that paragraphs 11–15 of the Amended Complaint set forth sufficient allegations to support common law tort claims.

▮▮▮▮ This court has discretion to exercise its supplemental jurisdiction over state law tort claims where a plaintiff's federal and state claims "derive from a common nucleus of operative fact" and are such that the plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The court will generally exercise supplemental jurisdiction if "considerations

of judicial economy, convenience and fairness to litigants weigh in favor of hearing the state and federal claims at the same time." *Id.* at 726, 86 S.Ct. at 1139; *see also* 28 U.S.C. § 1367(a) (1988) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution"). There can be no dispute that plaintiff's state and federal claims against defendant Scott arise out of a common nucleus of operative fact.

Defendants have not addressed plaintiffs' state law tort claims. Perhaps defendants assume that dismissal of plaintiffs' section 1983 federal claim would lead this court either to decline to exercise supplemental jurisdiction over the state law tort claims or to dismiss them. We need not determine whether such an assumption is warranted. Because we deny summary judgment dismissing the section 1983 federal claim against Scott, we retain supplemental jurisdiction over plaintiffs' state law tort claims against Scott as well.

### IV. Claims Against Defendant Village

#### A. Section 1983 Claim Against the Village

▮▮▮▮ A municipality is subject to section 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury...." *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56

*See also Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976) (recognizing "the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"). We conclude that the probative value of the evidence in this case outweighs the danger of unfair prejudice. Even assuming that Scott successfully invokes the Fifth Amendment privilege at trial, plaintiffs should be permitted to inform the jury that Scott

has invoked this privilege. There is little, if any, danger of undue prejudice to defendant Scott because he has been tried and acquitted of manslaughter for his actions involving the use of deadly force against Javid. The probative value of this evidence is great because the jury may draw a negative inference discrediting defendant Scott's testimony about facts and circumstances surrounding the fatal shooting. Absent Scott's own testimony at trial, the fact that he invoked the Fifth Amendment would be the only evidence available to challenge Scott's criminal trial testimony transcript.

L.Ed.2d 611 (1978). The policy or custom must be the "moving force of the constitutional violation." *Id.; City of Oklahoma City v. Tuttle,* 471 U.S. 808, 820, 105 S.Ct. 2427, 2434, 85 L.Ed.2d 791 (1985). Plaintiffs' Amended Complaint sets forth the requisite elements of a cause of action against the Village for having a policy of inadequate screening, training and supervision of police that directly caused Javid's fatality. *See, e.g., Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989) ("[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983."); *Fiacco v. City of Rensselaer, N.Y.,* 783 F.2d 319, 326 (2d Cir.1986) ("[A] policy that is not itself unconstitutional may provide the basis for municipal liability."), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987).

Defendants argue that a single incident of an alleged constitutional violation by a police officer does not suffice to demonstrate a municipal policy. *See Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) ("*Monell*'s rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional depravation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible."); *Tuttle,* 471 U.S. at 823, 105 S.Ct. at 2436 ("Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official; for example, [the police officer] would never have killed [the decedent] if Oklahoma City did not have a 'policy' of establishing a police force. But *Monell* must be taken to require proof of a city policy different in kind from this latter example before a claim be sent to a jury on the theory that a particular violation was 'caused' by municipal 'policy.' At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."). In addition, defendants cite *Turpin v. Mailet,* 619 F.2d 196 (2d Cir.), *cert. denied sub nom. Turpin v. City of West Haven,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), for the proposition that an incident of alleged illegality "such as a single arrest without probable cause or made with excessive force" is insufficient to impose liability upon a municipality as a matter of law.

Defendants' argument mirrors the reasoning in *Dwares v. City of New York,* 985 F.2d 94 (2d Cir.1993), where the Second Circuit dismissed a section 1983 claim against a municipal defendant on the ground that conclusory allegations of a policy or custom supported by a single alleged act of constitutional violation did not state a cause of action. The *Dwares* court held that in order to hold a municipality liable under section 1983 for the conduct of employees below the policymaking level,

> [t]he mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.... Similarly, the simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury. A single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy.

985 F.2d at 100 (citing *Tuttle,* 471 U.S. at 823–24, 105 S.Ct. at 2436–37; *Fiacco,* 783 F.2d at 328; *Turpin,* 619 F.2d at 202). However, we believe that these standards are no longer appropriate, in light of the United States Supreme Court's decision, *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), issued shortly after the *Dwares* decision. The Supreme Court held that a federal court may not apply a "heightened pleading standard"—more stringent than the usual pleading requirements of Federal Rule of Civil Procedure 8(a)—in civil rights cases alleging municipal liability under section 1983:

> We think that it is impossible to square the "heightened pleading standard" ... with the liberal system of "notice pleading" set up by the Federal Rules. Rule 8(a)(2) requires that a complaint include only "a short and plain statement of the claim showing that the pleader is entitled to relief."

507 U.S. at 168, 113 S.Ct. at 1163. The Supreme Court specifically rejected the argument that, to establish municipality liability under section 1983, "a plaintiff must do

more than plead a single instance of misconduct." 507 U.S. at 167, 113 S.Ct. at 1162. Instead the Court suggested that "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Id.* at 168–169, 113 S.Ct. at 1163.

Furthermore, the Second Circuit in *Turpin,* which is relied on by defendants, actually held that a single incident of alleged constitutional violation may support a claim against the municipality; the court simply found that plaintiff's evidence was insufficient to prove that the incident was the result of an official policy:

> We agree that, absent more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct, a policy could not ordinarily be inferred from a single incident of illegality such as a first arrest without probable cause or with excessive use of force.... However, a single, unusually brutal or egregious beating administered by a group of municipal employees may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision amounting to deliberate indifference or "gross negligence" on the part of officials in charge.

*Turpin,* 619 F.2d at 202.

Plaintiffs in the instant case specifically alleged a direct link between policies of the Village and the allegedly unconstitutional use of force. *See, e.g.,* Am.Compl. ¶ 28 ("[I]t was also a policy of the defendant VILLAGE OF MONROE to improperly and inadequately train and instruct the members of the Village of Monroe Police Department, including the defendant EDWARD SCOTT, in the proper manner of effectuating an arrest and in the proper exercise of self-restraint in the use of violence against civilians and persons being apprehended."). Plaintiffs' allegation, if proven true, would establish that the Village's policy and custom of inadequate screening, training or supervision directly caused the excessive use of force by Scott against Javid. We find that plaintiffs have satisfied the Rule 8(a) pleading requirement for asserting a valid section 1983 claim against the Village. Under *Leatherman,* we cannot dismiss plaintiffs' claim on the ground that "plaintiffs must do more than plead a single instance of misconduct."

However, on a motion for summary judgment, plaintiffs may not rest solely on the pleadings in their Amended Complaint. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Plaintiffs must "go beyond the pleadings and by [their] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* Plaintiffs have identified no evidence to support a claim that the Village had a policy or custom that caused the alleged constitutional violation. Therefore, we are inclined to grant summary judgment dismissing plaintiffs' section 1983 claim against the Village.

Plaintiffs have moved, pursuant to Rule 56(f), for a brief continuance in order to depose employees of the Village who have knowledge of the policies of the Village. Plaintiffs argue that the testimony necessary to support their claim that the Village had a policy that caused incompetent officers to act unconstitutionally was unavailable because defendant Scott invoked the Fifth Amendment during his deposition, and plaintiffs assumed that they would depose employees of the Village after taking Scott's deposition. Although we have some doubt that such depositions will supply sufficient basis to defeat defendants' motion, we exercise our discretion to grant plaintiffs a limited additional time for discovery. A brief extension will not result in undue prejudice to defendants.

Defendants argue correctly that respondeat superior is unavailable for asserting 1983 liability against the Village. Under *Monell,* a plaintiff must plead and prove a policy or custom that directly causes the constitutional violation. It is well settled that liability under section 1983 against a municipality cannot be imposed vicariously or on other grounds of respondeat superior. *See Pembaur v. Cincinnati,* 475 U.S. 469, 478, 106 S.Ct. 1292, 1297, 89 L.Ed.2d 452 (1986); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). However, plaintiffs do not assert section 1983 liability under the theory of respondeat superior. They assert section 1983 liability based on an alleged policy on the part of the Village that directly caused a constitutional violation to plaintiffs. Plaintiffs assert respondeat superior to sup-

port their common law tort claims against the Village.

### B. State Common Tort Claims Under Respondeat Superior

■ We have discretion to exercise supplemental jurisdiction over related state law claims. As previously mentioned, defendants have not directly addressed the common law tort claims against the Village, which are based on a theory of respondeat superior. Allowing such claims against the Village would undermine the *Monell* requirement that plaintiffs prove direct causation between acts of the Village and the alleged constitutional violation. Plaintiffs may not invoke respondeat superior to circumvent the strict requirements for establishing municipal liability for allegedly unconstitutional acts by police officers, as clearly established by Supreme Court decisions.

However, our conclusion that respondeat superior may not serve as a basis for liability against the Village does not end the inquiry. Plaintiffs may still establish liability directly, and we grant plaintiffs leave to complete discovery in order to determine whether or not any evidence supporting such liability exists.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment with respect to claims against Scott is denied, and consideration of defendants' motion for summary judgment with respect to claims against the Village is deferred pending further opportunity for discovery. Plaintiffs shall complete discovery within thirty (30) days of the date of this order and file any supplement to their previous submissions on this motion within forty-five (45) days of the date of this order.

SO ORDERED.

### OPINION AND ORDER

March 4, 1996

Plaintiffs Eleanor Javid, as administratrix of the estate of Tige Javid ("Javid"), deceased, and Kamal Javid and Eleanor Javid (Javid's parents), individually, brought this action pursuant to 42 U.S.C. § 1983, alleging that defendant Edward Scott ("Scott") violated their constitutional rights by the use of deadly force in apprehending Javid, and that defendant Village of Monroe (the "Village") had a policy of inadequately screening, training and supervising police officers. Plaintiffs also asserted common law tort claims against Scott for assault, battery and wrongful death, and against the Village under the theory of respondeat superior.

Defendants moved for summary judgment dismissing plaintiffs' claims. By opinion and order dated January 19, 1996 (the "Order"), this court denied summary judgment with respect to claims against Scott, and deferred consideration of summary judgment with respect to claims asserted against the Village pending further opportunity for discovery. We ordered plaintiffs to complete discovery within thirty days from the date of the Order and to file any supplement to their previous submissions within forty-five days from the date of the Order.

Because plaintiffs have advised the court that they are discontinuing their claims against the Village, and for reasons set forth in the Order, plaintiffs claims against the Village are dismissed with prejudice.

SO ORDERED.